# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

      Plaintiff,

vs.                                           No. CR 19-3725 JB

JODY RUFINO MARTINEZ,

      Defendant.

## UNSEALED MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on the Defendant's Sealed Motion for New Trial, filed April 13, 2021 (Doc. 275)("Motion."). The Court held a hearing on June 3, 2021. See Clerk's Minutes at 1, filed June 3, 2021 (Doc. 296). The primary issues are: (i) whether, under rule 33 of the Federal Rules of Civil Procedure, the Court should order a new trial, because Federal Bureau of Investigation ("FBI") Special Agent Brian Acee's testimony on the first day of the evidentiary portion of the trial about an alleged threat that Defendant Jody Rufino Martinez and other Sindicato de Nuevo Mexico (Spanish for Syndicate of New Mexico)("SNM") gang members and associates made against Acee, an Assistant United States Attorney, and the Court raises reasonable questions about the Court's impartiality under 18 U.S.C. § 455 and United States v. Greenspan, 26 F.3d 1001 (10th Cir. 1994)("Greenspan"); and (ii) whether the Court should recuse from sentencing Martinez, because the alleged threats raise reasonable questions about the Court's impartiality. The Court concludes that: (i) it will not grant a new trial, because Greenspan is distinguishable: (a) the Court was not aware of the connection between Martinez and the threat until after trial; (b) even if the Court had been aware of Martinez' threat, the threat is not as serious as the one in

---

[1]The parties did not request any redactions to the Court's Sealed Memorandum Opinion and Order, filed July 12, 2021 (Doc. 302).

Greenspan; and (c) the Court has not, and Martinez does not allege that, the Court took any actions to accelerate trial proceeding to reduce the risk to it; and (ii) it will not recuse from sentencing, because a reasonable person, knowing all the facts, would not question its impartiality, where: (a) the Court does not have any discretion in sentencing Martinez to life imprisonment on Count 1; (b) Martinez' alleged threat against the Court is not as serious as in Greenspan; and (c) the Court has not, and Martinez does not allege that, the Court has taken any action against him because of the threat. Accordingly, the Court denies the Motion. In addition, the Court directs Plaintiff United States of America to share this Memorandum Opinion and Order, and the briefing for the Motion, with its appellate lawyers and determine whether it will defend the Court's decision on appeal and not confess error.

## **FINDINGS OF FACT**

The Court sets forth its findings of fact to provide context to Motion. This case deals with the crimes that the SNM allegedly committed through its members. See First Superseding Indictment ¶¶ 1, 3, at 1-2, filed December 11, 2019 (Doc. 33). In the first section, the Court sets forth background facts related to the SNM, facts which the Court takes from the indictments. See First Superseding Indictment; Second Superseding Indictment, filed January 9, 2020 (Doc. 56). Second, the Court discusses facts related to other SNM cases before the Court. Third, the Court discusses facts related to the United States' case against Martinez. Fourth, the Court discusses facts related to the SNM threats, including the FBI warrant, affidavit, and arrests. Fifth, the Court discusses facts related to Martinez' jury trial. Sixth, the Court discusses facts related to the Albuquerque Journal Article's reporting on the alleged threat. Seventh, and last, the Court discusses facts related to how the United States Marshals de-escalated their security after the arrests.

1.      **General Background on the SNM Gang**.

1.      The SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including, murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking."  First Superseding Indictment ¶ 1, at 1.

2.      The SNM constitutes an enterprise "as defined in Title 18, United States Code, Sections 1959(b)(2) and 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which affected interstate and foreign commerce."  First Superseding Indictment ¶ 2, at 2.

3.      The enterprise is "an ongoing organization whose members/prospects/associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise."  First Superseding Indictment ¶ 2, at 1-2.

4.      The SNM is a prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM, during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage.  First Superseding Indictment ¶ 3, at 2.

5.      During the riot, thirty-three inmates were killed, and over 200 inmates were injured. See First Superseding Indictment ¶ 3, at 2.

6.      After the PNM riot, the SNM expanded throughout the State's prison system and has had as many as 500 members at one time.  See First Superseding Indictment ¶ 4, at 2.

7.      The SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members."  First Superseding Indictment ¶ 4, at 2.

8.	The SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system.  <u>See</u> First Superseding Indictment ¶¶ 3, 5, at 2-3.

9.	Members who rejoin their communities after completing their sentences are expected to further the gang's goals, primarily the control of, and the profit from, narcotics trafficking.  <u>See</u> First Superseding Indictment ¶ 5, at 3.

10.	Members who fail "to show continued loyalty to the gang" may be assaulted or murdered.  Indictment ¶ 5, at 3.

11.	The SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities.  <u>See</u> First Superseding Indictment ¶ 6, at 3.

12.	If another gang does not abide by the SNM's demands, the SNM will assault or kill one of the other gang's members to show SNM's power.  <u>See</u> First Superseding Indictment ¶ 6, at 3.

13.	The SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. <u>See</u> First Superseding Indictment ¶ 7, at 3.

14.	The SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others."  First Superseding Indictment ¶ 7, at 4.

15.	"Similarly, a member of the SNM Gang is expected to confront and attack any suspected law enforcement informants, cooperating witness[es], [gay people], or sex offenders." First Superseding Indictment ¶ 8, at 4.

16.	To achieve its purpose of maintaining power, the SNM uses intimidation, violence,

threats of violence, assault, and murder.  See First Superseding Indictment ¶¶ 6-8, at 3-4.

17.    The SNM, as an enterprise, generates income by having its members and associates traffic controlled substances and extort narcotic traffickers.  See First Superseding Indictment ¶ 7, at 4.

18.    The SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department officials inspired the Federal Bureau of Investigation's present investigation.  See United States Notice of Related Cases, filed October 16, 2019 (Doc. 15).[2]

**2.    SNM Cases Before the Court.**

19.    The Court has presided over several SNM related cases in addition to this case.  See United States v. Padilla, et al, No. CR 19-3113 (D.N.M.)(Browning, J.)(a twelve-defendant prosecution for drug crimes, including Robert Padilla); United States v. DeLeon, No. CR 15-4268 (D.N.M.)(Browning, J.);  United States v. Baca, No. CR 16-1613 (D.N.M.)(Browning, J.)(involving twelve defendants, all alleged SNM members or associates, who have allegedly

_____

[2]The United States asserts that this case "is related to the subject matter in the following cases:"

1.    U.S. v. Angel DeLeon, et al., [15-CR-4268 JB;]

2.    U.S. v. Anthony Baca et al., [16-CR-1613 JB;]

3.    U.S. v. Jonathan Gomez, a.k.a. "Baby G," [19-CR-3726 JB;]

4.    U.S. v. Gary Coca, Case No. [20-CR-1924 JB;]

5.    U.S. v. Gregory Montoya, a.k.a. "Jinx," [20-CR-1313 JB;]

6.    U.S. v. Anthony Paul Salazar, [20-CR-0136 JB;]

7.    U.S. v. Leopoldo Salazar, [19-CR-4657 JB; and]

8.    U.S. v. Robert Trujillo, [20-CR-0221 JB.]

United States Notice of Related Cases at 1, filed October 16, 2019 (Doc. 15).

engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d)); United States of America v. Garcia, No. CR 15-4275 (D.N.M.)(Browning, J.)(involving a separate prosecution of C. Garcia for drug crimes); United States v. Varela, No. CR 15-4269 (D.N.M.)(Browning, J.)(a four-defendant prosecution for alleged violent crimes in aid of racketeering, under 18 U.S.C. § 1959; United States v. Gallegos, No. CR 16-429 (D.N.M.)(Browning, J.)(involving a defendant severed from United States v. Baca).[3]

**3.** **The United States' Case Against Martinez.**

20.     On August 23, 2019, the United States filed the Criminal Complaint (Doc. 1)("Complaint").

21.     The Complaint alleges that Martinez violated 18 U.S.C. § 922(g)(1): Felon-in-Possession of a Firearm.  See Complaint at 1.

22.     Martinez was arrested on September 19, 2019.  See Arrest Warrant Returned Executed, filed September 19, 2019 (Doc. 7).

23.     A federal grand jury filed the Indictment on October 16, 2019 (Doc. 16).

24.     The Indictment charges Martinez with violating 18 U.S.C. §§ 922(g)(1) and 924: Felon-in-Possession of a Firearm and Ammunition.  See Indictment at 1.

25.     Martinez pleaded not guilty at his arraignment.  See Clerk's Minutes at 1, filed October 23, 2019 (Doc. 19).

26.     The Court scheduled a jury trial on Martinez' charges.  See Notice of Jury

---

[3]The Court held two trials in United States v. DeLeon, 15-CR-4268 JB.  In the end, the Court held one four-defendant trial ("First DeLeon Trial") and one seven-defendant trial ("Second DeLeon Trial").  Across these two trials, the juries found eight of the eleven DeLeon Defendants guilty of violating Violent Crimes in Aid of Racketeering Act, 18 U.S.C. § 1959 ("VICAR").  See United States v. DeLeon, 15-CR-4268 JB, Jury Verdict at 1-3, filed March 12, 2018 (Doc. 1947); United States v. DeLeon, 15-CR-4268 JB, Jury Verdict at 1-5, filed May 25, 2018 (Doc. 2332).

Selection/Jury Trial at 1, filed October 24, 2019 (Doc. 21).

27.     On December 11, 2019, the United States filed the First Superseding Indictment, charging Martinez with two counts: (i) Count 1: 18 U.S.C. § 1962(d): Racketeering Conspiracy; and (ii) 18 U.S.C. §§ 922(g)(1) and 924: Felon-in-Possession of a Firearm and Ammunition. See First Superseding Indictment at 1-12.

28.     Count 1 charges Martinez, as a SNM gang member since 1980, together with other people associated with the SNM, with "conspir[ing] to . . . conduct and participate, directly and indirectly, in the conduct of the affairs of the SNM Gang enterprise through a pattern of racketeering activity." First Superseding Indictment at 7.

29.     The First Superseding Indictment alleges that Martinez and "others known and unknown to the Grand Jury" committed sixteen "overt acts . . . in furtherance of the conspiracy, and to accomplish the goals of the conspiracy." First Superseding Indictment at 8-11.

30.     The alleged sixteen overt acts are:

(i)     "In 1980, a group of inmates at the Penitentiary of New Mexico formed the SNM Gang";

(ii)    "Beginning in the 1980s, the SNM Gang designated the prison gangs, Los Carnales and the Nortenos, as their rivals and issued orders to the SNM Gang to assault their rivals whenever possible";

(iii)   "Beginning in the 1980s and continuing up to the present time, the SNM Gang established a hierarchy within the gang, rules, and procedures, and recruited street gang members and inmates from around New Mexico to commit and aid of" various crimes;

(iv)    "On or about June 1998, while incarcerated in the NMCD, **JODY RUFFINO**

MARTINEZ was recruited and joined the SNM Gang in Milan, New Mexico";

(v)    "On or about December 22, 1998, while incarcerated in the NMCD, **JODY RUFFINO MARTINEZ** admitted his SNM Gang membership to NMCD officials and claimed he was a Soldier within the SNM";

(vi)   "On or about December 22, 1998, while incarcerated in the NMCD, **JODY RUFFINO MARTINEZ** possessed an SNM tattoo of a Zia symbol with 'SNM' in the middle";

(vii)  "On or about April 1, 1999, while incarcerated in the NMCD, **JODY RUFFINO MARTINEZ** possessed a drawing with 'SNM' and 'S' on it";

(viii) "On or about April 1, 1999, while incarcerated in the NMCD, **JODY RUFFINO MARTINEZ** possessed names and addresses of SNM members and associates and an amnesty agreement between Barrio Azteca Gang and SNM Gang";

(ix)   "On or about October 31, 1999, while incarcerated in the NMCD, **JODY RUFFINO MARTINEZ** battered a corrections officer";

(x)    "On or about March 12, 2008, **JODY RUFFINO MARTINEZ** attempted to commit a robbery with another SNM Gang member and another individual affiliated with a street gang";

(xi)   "On or about June 12, 2015, **JODY RUFFINO MARTINEZ** possessed a handgun, heroin, and methamphetamine";

(xii)  "On or about November 5, 2016, while incarcerated in the NMCD, **JODY RUFFINO MARTINEZ** and J.M., another SNM member, assaulted R.D. **JODY RUFFINO MARTINEZ** and J.M. were later heard saying they 'should have just stuck him'";

(xiii) "On or about October 24, 2018, **JODY RUFFINO MARTINEZ** possessed a firearm and ammunition";

(xiv) "On or about October 24, 2018, **JODY RUFFINO MARTINEZ** did unlawfully and knowingly shoot a rival, D.S.";

(xv) "Between October 24, 2018 and June 7, 2019 **JODY RUFFINO MARTINEZ** did attempt to intimidate witness, L.L., by trying to persuade the witness not to cooperate with law enforcement about the shooting incident"; and

(xvi) "On or about January 7, 2019, S.B., **JODY RUFFINO MARTINEZ'** girlfriend, retaliated against D.S. for cooperating with law enforcement following the shooting. S.B. provided paperwork to an inmate in the Rio Arriba County Detention Facility regarding D.S.'s cooperation, and D.S. was subsequently assaulted by inmates at the facility."

First Superseding Indictment at 9-11 (emphasis and capitalization in the original).

31.     Count 2 of the First Superseding Indictment charges that Martinez, having already been convicted of a prior felony, knowingly possessed a firearm and ammunition in and affecting commerce on October 24, 2018.  See First Superseding Indictment at 11-12.

32.     On January 9, 2020, the federal grand jury filed the Second Superseding Indictment, charging Martinez with four counts, adding two additional counts to the ones in the First Superseding Indictment.  See Second Superseding Indictment at 1-14.

33.     Count 1 charges Martinez with the murder of D.R., alleging:

On or about December 5, 2008, in Rio Arriba County, in the District of New Mexico, as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing the position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise in racketeering activity, the defendant, **JODY RUFINO MARTINEZ,**

**a.k.a. "Mono,"** did unlawfully, knowingly, and intentionally murder D.R., in violation of NMSA 1978, Sections 30-2-1 and 301-113.

All in violation of 18 U.S.C. §§ 1959(a)(1) and (2).

Second Superseding Indictment at 7-8.

34.    Count 1 also includes a notice of special findings, alleging that (i) Martinez was older than eighteen years at the time he murdered D.R., <u>see</u> 18 U.S.C. § 3591(a); (ii) Martinez "intentionally killed D.R. (18 U.S.C. § 3591(a)(2)(A))"; (iii) Martinez "intentionally inflicted serious bodily injury that resulted in the death of D.R. (18 U.S.C. § 3591 (a)(2)(B))"; (iv) Martinez "has a previous conviction for a violent felony involving firearms (18 U.S.C. § 3592(c)(2))"; (v) Martinez "has previous convictions of other serious offenses (18 U.S.C. § 3592(c)(4))"; and (vi) Martinez "committed the offense after substantial planning and premeditation to cause the death of D.R. (18 U.S.C. § 3592(c)(9))."  Second Superseding Indictment at 8.

35.    Count 2 charges Martinez, as a member of the SNM Gang since 1980, together with other people associated with the SNM Gang, with "conspir[ing] to . . . conduct and participate, directly and indirectly, in the conduct of the affairs of the SNM Gang enterprise through a pattern of racketeering activity."  Second Superseding Indictment at 9.

36.    The Second Superseding Indictment alleges that Martinez and "others known and unknown to the Grand Jury" committed nineteen "overt acts . . . in furtherance of the conspiracy, and to accomplish the goals of the conspiracy."  Second Superseding Indictment at 10-13.

37.    Sixteen of the nineteen overt acts in the Second Superseding Indictment are the same as those in the First Superseding Indictment; the Second Superseding Indictment adds an additional three overt acts, alleging that: (i) "[o]n or about December 5, 2008, **JODY RUFINO MARTINEZ** killed D.R. for failing to deliver drugs to an SNM gang member"; (ii) "[i]n October 2019, while incarcerated in the Santa Fe County Adult Detention facility, **JODY RUFINO**

**MARTINEZ**, placed a 'green light' on D.S. and intended to have D.S. killed"; and (iii) "[o]n or about December 12, 2019, while incarcerated in the Santa Fe County Adult Detention Facility, **JODY RUFINO MARTINEZ**, threatened physical force against J.L. with the intent to influence, delay, or prevent J.L. from testifying against **JODY RUFINO MARTINEZ** in an official proceeding." Second Superseding Indictment at 10-13 (Overt Acts 11, 18, and 19).

38.     Count 3 charges Martinez with tampering with a witness, alleging that, on or about December 12, 2019, Martinez "used and attempted to use physical force and the threat of physical force against J.L. with the intent to influence, delay, or prevent J.L. from testifying against **RUFINO MARTINEZ** in an official proceeding." Second Superseding Indictment at 13 (citing 18 U.S.C. § 1512(a)(2)(A)).

39.     Count 4 of the Second Superseding Indictment, as with the First Superseding Indictment, charges Martinez, having already been convicted of a prior felony, with knowingly possessing a firearm and ammunition in and affecting commerce on or about October 24, 2018. See Second Superseding Indictment at 13-14.

### 4.     SNM's Threats.

40.     On or about December, 2020, the United States Marshals alerted the Court that Robert Padilla[4] wanted to "light up the Court."

41.     The Marshals told the Court that it was a "future" threat, in that Padilla's trial is set for October 18, 2021.

42.     Because of the threat, the Marshals increased security on the Court.

43.     As the Martinez trial got closer, the concerns seemed to become that Padilla wanted

---

[4]Robert Padilla is an alleged SNM associate. The Court presides over Padilla's criminal case. See United States v. Padilla, 19-CR-3113 JB.

to kill cooperating witnesses as they came to the courthouse for the Martinez trial, because the SNM did not know where some cooperating witnesses were.

44.     The Court does not recall Martinez being connected with this threat.

        a.     **The FBI's Warrant and Affidavit Related to the Alleged SNM Threats.**

45.     On March 1, 2021, the Honorable Karen B. Molzen, United States Magistrate Judge for the District of New Mexico, signed a sealed search warrant for offenses related to "RICO Act conspiracy;[5] VICAR;[6] intimidating and retaliating against a witness, victim, or informant; use of a firearm in furtherance of violent crime or drug trafficking; felon in possession of a firearm, aid and abet, maintain drug premises, conspiracy and possession with intent to distribute controlled substances." Search Warrant at 1, filed April 13, 2021 (Doc 275-1)("Warrant").[7]

46.     FBI Special Agent Acee provided an affidavit in support of the application for the search warrant. See Affidavit of Bryan Acee at 2-8, filed April 13, 2021 (Doc 275-1)("Acee Aff.").[8]

---

[5]The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-68 ("RICO"), prohibits specific activities when they are committed in connection with a pattern of racketeering activity. E.g., 18 U.S.C. § 1962(b)("It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.").

[6]A Violent Crimes in Aid of Racketeering Act, 18 U.S.C. § 1959 ("VICAR"), violation requires an underlying state-law offense, i.e., someone "murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do." 18 U.S.C. § 1959(a).

[7]Martinez filed under seal the first page of the Warrant and eight pages of an attached affidavit in support of the warrant as one document.

[8]Martinez filed the eight pages of the Acee Aff. as part of the same document as the Warrant; the Court refers to them separately for clarity and refers to pages numbers of the document filed on CM/ECF.

47.     In the Acee Aff., Acee states that he was aware of SNM gang members threatening

to harm the presiding judge:

> **The Present-Day Status of the Investigation:** FBI continues to monitor the SNM and target certain members for prosecution, based on their relentless commitment to criminal activity. The United States, through its investigative team, has become aware of grave threats directed at several government witnesses and cooperating defendants in the United States' case against the SNM. Moreover, I am aware certain members of the gang have advocated for FBI agents, federal prosecutors, and the presiding federal judge to be harmed.
>
> . . . .
>
> Over the past several weeks, case agents have become aware of numerous threats aimed at government witnesses, federal prosecutors, FBI agents, and the presiding federal judge in the United States' case against the SNM.
>
> . . . .
>
> Example 12: In January 2017, an SNM member who was incarcerated in the NMCD for first degree murder was debriefed by the government. The SNM member was the highest-ranking member of the SNM at the Southern New Mexico Correctional Facility in Las Cruces, New Mexico, at the time. During the interview, the SNM member said the SNM wanted to hit an FBI agent, prosecutor or judge if the opportunity presented itself, due to the RICO prosecution of the gang.

Acee Aff. ¶¶ 20, 22, 70, at 2-4 (emphasis in the original).

48.     In the Acee Aff., Acee states that Martinez was involved in the threats against the

Court:

> Example 23: In late November 2020, a cooperating defendant within the Cibola County Correctional Center in Milan, New Mexico, overheard SNM members JONATHON GOMEZ, aka: "BABY G.," SERGIO RODRIGUEZ, aka: "CHURO," TONEY GAUNA, aka: "WHISKERS," ROBERT TRUJILLO, aka: "SLEEPY," JODY RUFINO MARTINEZ, aka: "MONO," ANGEL DELEON, and SNM associate ROBERT PADILLA, aka: "FAT HEAD," discussing the government's case against the SNM. All of the aforementioned SNM members (other than ROBERT TRUJILLO) were charged with RICO violations. JODY RUFINO MARTINEZ and ANGEL DELEON are awaiting trial on VICAR murder charges. SNM associate ROBERT PADILLA is in custody on federal drug charges. The SNM members and ROBERT PADILLA discussed putting a green light on

"Acee, Armijo, and Browning,"[9] and "lighting up the courtroom" when the case(s) went to trial.

. . . .

In late November 2020 and/or early December 2020, CHS-3 was incarcerated at the Cibola County Correctional Center with SNM members JODY RUFINO MARTINEZ, aka: "MONO," JONATHAN GOMEZ, aka: "BABY G," TONY GAUNA, aka: "WHISKERS," VINCENT GARDUNO, aka: "FATAL," ANGEL DELEON, ROBERT TRUJILLO, aka: "SLEEPY," and SNM associate ROBERT PADILLA, aka: "FAT HEAD." CHS-3 reported the aforementioned SNM members and associate discussing the fact that a greenlight had been put on Bryan Acee, a federal judge, and an AUSA. The men also discussed "lighting up the courtroom" when they were on trial.

Acee Aff. ¶ 83, at 5-7 (emphasis in the original).

49.    The Warrant and Acee Aff. was filed in five sealed cases.  See Warrant at 1 (listing 21-mr-262; 21-mr-263; 21-mr-264; 21-mr-264; and 21-mr-266).

**5.    Martinez' Jury Trial.**

50.    The Court held a jury trial starting March 1, 2021, and ending March 16, 2021.  See Clerk's Minutes at 1, filed March 1, 2021 (Doc. 265)("Trial Minutes").

51.    The trial was initially projected to last four-weeks.

   **a.    Selecting the Jury.**

52.    The Court selected the jury over two days.  See Trial Minutes at 1.

53.    Jury selection took place in the Rio Grande courtroom, the largest courtroom in the PVD Courthouse.

54.    Pursuant to the District of New Mexico's COVID-19 plan for jury trials, to practice COVID-19 safe practices, the Rio Grande courtroom could accommodate a maximum of twenty-

---

[9]The Acee Aff. includes a footnote, which states: "FBI Special Agent Bryan Acee, Assistant U.S. Attorney Maria Armijo, and U.S. District Court Judge James Browning."  Acee Aff. ¶ 83 n.7, at 6.

two prospective jurors.

55.     Because the Rio Grande courtroom could only accommodate twenty-two jurors at a time, jury selection was divided into a morning and an afternoon wave of twenty-two people each wave.  <u>See</u> Trial Minutes at 1-6.

56.     To maintain appropriate social distancing, prospective jurors were seated six feet apart.

57.     During voir dire, prospective jurors used face shields rather than, or in addition to, masks.

58.     The Court wore a face shield; attorneys and Court staff wore masks.

59.     During voir dire, and when the jury was seated, jurors were placed in the jury box and the gallery area with pews taken out and replaced by chairs.

60.     On March 1, 20212, while the Court was selecting the Martinez jury, Acee submitted the Acee Aff. in support of the Warrant, which Judge Molzen signed.  <u>See</u> Warrant at 1; Acee Aff. at 2-8.

61.     On March 2, 2021, the Court selected and swore in twelve jurors and four alternates. <u>See</u> Trial Minutes at 4-6.

62.     After the jury was sworn in, the parties gave opening arguments.  <u>See</u> Trial Minutes at 6.

       **b.**      **<u>FBI Special Agent Acee Testifies About the Alleged Threats</u>.**

63.     Around 5:00 a.m. on Wednesday, March 3, 2021, the FBI executed the Warrant. <u>See</u> Transcript of Trial Day 3 at 154:7-13 (taken March 3, 2021)(Harrison, Acee)("Trial Tr. Day 3"); <u>id.</u> at 181:1-5 (Acee).

64.     Wednesday, March 3, 2021, was the first day of evidence.  <u>See</u> Trial Minutes at 6.

65.     Somewhat to the Court's surprise, the United States' first witness was not Acee, but Jerry Roark.  See Trial Minutes at 6.

66.     In the past SNM trials, the United States would call Acee early or first, show pictures of SNM members in underwear, and have Acee identify the defendants and key players, and their tattoos, which often link the players to SNM.

67.     The second witness was Acee.  See Trial Minutes at 6; Trial Tr. Day 3 at 36:6-7 (Castellano).

68.     The United States asked Acee whether he had arrested "anybody, even this morning before court, who were SNM Gang members?"  Trial Tr. Day 3 at 123:3-4 (Castellano).

69.     Acee "arrested four SNM gang members this morning and one two days ago."  Trial Tr. Day 3 at 123:5-6 (Acee).

70.     During the arrest two days before the evidentiary portion of the trial, Acee recovered a loaded firearm, and, during the arrest that morning, the FBI recovered four guns and drugs.  See Trial Tr. Day 3 at 123:9-11 (Acee).

71.     After the United States asked about the arrests, it passed the witness.  See Trial Tr. Day 3 at 123:15-16 (Castellano).

72.     Martinez then asked for a bench conference.  See Trial Tr. Day 3 at 123:20-21 (Harrison).

73.     Martinez' counsel, Mr. Carter Harrison, told the Court and the United States that he did not know about the arrests, and that "I've been trying to not object to this stuff because of the nexus to Rufino" Martinez.  Trial Tr. Day 3 at 123:24-124:1 (Harrison).

74.     Mr. Harrison asked if the United States was "contending that th[e]" arrests "[a]re related to" Martinez?  Trial Tr. Day 3 at 124:1-4 (Harrison).

75.     Counsel for the United States, Mr. Randy Castellano, stated "No," the arrests "relate[] to threats against a witness," but they "have nothing to do with the Defendant," and did not "relate . . . directly" to Martinez.  Trial Tr. Day 3 at 155:12-16 (Castellano).

76.     Mr. Castellano explained:

It relates to threats against a witness, and I didn't want to bring that out in front of this jury.  I have no intention of doing so.  It was a threat against a witness that we're trying to present and testify in this case, but I'm not bringing that out through. Obviously, and -- anyway, the matter [has] to do a lot with . . . whether or not the SNM was alive and well, whether or not they are largely a defunct organization. So it has to do with more than that, than Mr. Martinez in particular.

Trial Tr. Day 3 at 155:12-156:1 (Castellano).

77.     Martinez' co-counsel, Mr. Nicholas Hart, asked the United States whether the arrests "are all related to witness intimidation?"  Trial Tr. Day 3 at 156:7-8 (Hart).

78.     Mr. Castellano: "It tends to be.  We're looking at that."  Trial Tr. Day 3 at 156:9-10 (Castellano).

79.     Mr. Hart stated that Martinez "had no discovery on anything, now they've submitted testimony that we're supposed to do cross-examination and this is literally the first we've heard of these arrests."  Trial Tr. Day 3 at 156:11-15 (Hart).

80.     The Court asked the United States what disclosure it could give Martinez.  See Trial Tr. Day 3 at 156:16-17 (Court).

81.     Mr. Castellano stated that it had "a sealed affidavit related to some searches."  Trial Tr. Day 3 at 156:18-19 (Castellano).

82.     The United States asked the Court to unseal the affidavit, so that it could show the affidavit to Martinez, but stated that it did not want the affidavit published, because "[w]e don't want any publicity about it, but I'll ask Agent Acee to check and just to turn  it over to the defense." Trial Tr. Day 3 at 156:18-24 (Castellano).

83.    Mr. Hart stated that "works for us."  Trial Tr. Day 3 at 157:1 (Hart).

84.    The Court did not unseal the Acee Aff. that time.  <u>See</u> Trial Minutes at 6-7; Trial Tr. Day 3 at 203:12-15 (Court, Harrison).

85.    Martinez did not make a motion for the Court to recuse, and the Court never thought on its own that it should recuse, because it did not connect Martinez to the threat on the Court.

86.    All men in ¶ 83 of the Acee Aff. were in custody, and while the Court mistakenly thought that the four arrests on Wednesday morning were not related to the threat on the Court, at the time, with Acee's testimony, the Court thought all men related to the threat on the Court where now in custody.

87.    The bench conference ended, and Mr. Harrison started his cross-examination of Acee.  <u>See</u> Trial Tr. Day 3 at 157:8-13 (Harrison).

88.    During cross-examination, Mr. Harrison asked Acee about the alleged threats: "Now, a couple of things that you mentioned I just wanted to clear up because they were said on direct.  You had mentioned a plot to kill FBI agents and prosecutors.  Do you recall saying that on direct, or mentioning it?"  Trial Tr. Day 3 at 179:12-16 (Harrison).

89.    Mr. Harrison did not specifically mention the Court or a federal judge in his question.  <u>See</u> Trial Tr. Day 3 at 179:12-16 (Harrison).

90.    Acee stated that he was "intimately familiar with those threats."  Trial Tr. Day 3 at 179:17-18 (Acee).

91.    Mr. Harrison asked whether "Rufino Martinez [had] anything to do with them?" Trial Tr. Day 3 at 179:19-20 (Harrison).

92.    The Court was surprised by the question, and the Court was trying to figure out why Mr. Harrison would want to ask that question.

93.     Acee responded that Martinez had something to do with the threats at "one time." Trial Tr. Day 3 at 179:21 (Acee).

94.     Mr. Harrison then asked Acee how he knew that "Martinez was involved with a plot to assassinate FBI agents and federal prosecutors," but did not mention the Court: "Okay, well -- okay. So without telling me anything that -- the substance of anything that anyone told you, what interviews give you the idea that Rufino Martinez was involved with a plot to assassinate FBI agents and federal prosecutors?" Trial Tr. Day 3 at 179:24-180:3 (Harrison).

95.     Acee answered:

> I can think of two. And I'll go slowly so I answer your question the way you want me to. The first one was after the FIT[10] charge. So right around, I think, the RICO VICAR timeline, somewhere in one of the superseding indictments. We got that information out of the Santa Fe County Detention Center, if I remember correctly. I can say who was involved or who were the targets of the threat, if you want, but I don't have to. The second time it came up was more recently at Cibola.

Trial Tr. Day 3 at 180:4-13 (Acee).

96.     After Mr. Harrison asked Acee a series of questions about how Acee had obtained the information from informants, Mr. Harrison asked: "We're scrambling. We've got to react to your testimony. So . . . I just wanted to . . . close off the threats against FBI agents and prosecutors, just for completeness. I think there was a judge's name was floated on one of those; is that correct?" Trial Tr. Day 3 at 187:6-11 (Harrison).

97.     Acee responded: "Yes," but did not state the judge's name or refer to the Court. Trial Tr. Day 3 at 187:12 (Acee).

98.     At the time of Acee's testimony, no one had as of yet been attacked based on the threats, but Acee "d[id]n't know that they're over," because sometimes SNM does not act

---

[10]The transcript says "FIT," but the Court does not know for what "FIT" stands; the Court assumes that it should read "FIP" for felon-in-possession.

immediately on its threats.  Trial Tr. Day 3 at 187:13-17 (Harrison, Acee).

99.    While the jury was dismissed for lunch, Mr. Castellano asked the Court to "partially unseal" the warrant "for disclosure to the Defense only."  Trial Tr. Day 3 at 203:7-11 (Castellano).

100.    After Mr. Harrison stated that he did not object, the Court stated that the United States "can go ahead and do it."  Trial Tr. Day 3 at 203:12-15 (Court, Harrison).

101.    The Warrant and Acee Aff. were partially unsealed and the United States gave the documents to Martinez.  See Trial Minutes at 7.

102.    At some point during the discussion of the Warrant and the Acee Aff., a court employee, one of the Court's two courtroom deputies ("CRD") during the trial, was handed a copy of the Warrant and the Acee Aff.

103.    The CRD looked through the Acee Aff., but she too did not see that Martinez was connected to the alleged threats.

104.    The CRD highlighted the portions that discussed the threat on the Court.

105.    The Court recalls that the CRD showed the Court a few highlighted pages, which made reference to the Court, but the Court did not read all the capitalized names carefully and did not make the connection between Martinez and the threat

106.    The Court does not recall anything connecting Martinez to the alleged threats on the Court, and, in any case, the Court did not mentally connect Martinez to the alleged threats on the Court.

107.    Two of the Court's law clerks briefly saw the Acee Aff. but did not look at it closely.

108.    Neither of the law clerks connected Martinez to the alleged threat.

109.    The Court then stood in recess for the afternoon break.  See Trial Tr. Day 3 at

203:17-19 (Court); Trial Minutes at 8.

110.    After the break, Mr. Hart moved for a mistrial, because the United States had not

disclosed information related to Acee's testimony on the threats.  See Trial Tr. Day 3 at 204:1-2

(Hart); Trial Minutes at 8.

111.    The Court still did not pick up that Martinez was involved in the threat on the Court.

112.    Mr. Hart did not argue that the Court should recuse itself because of the alleged

threats.  See Trial Tr. Day 3 at 204:1-206:2 (Hart).

113.    Mr. Hart argued:

Mr. Martinez is just moving for a mistrial, Your Honor, based on the failure to
disclose the information that Agent Acee testified to and was elicited on cross about
the incidents that happened this morning.  We just got this in our hand.  When we
approached the bench, Your Honor, the Government had represented that this dealt
solely with witness -- tampering of a witness in this case.  We took them at their
word.

      When Mr. Harrison stood up to cross Special Agent Acee, Special Agent
Acee testified that it also deals with threats against FBI agents and federal
prosecutors that was not disclosed when we were at the bench.  None of the
information related to this had been disclosed prior, but what is interesting, I did go
back and look in the discovery, and the only reference at all, when it comes to Mr.
Martinez and threats upon FBI agents and the hundreds of thousands of pages of
documents that we have, is a 302[11] from January 19 of 2021 where Special Agent
[Nancy] Stemo states that she had listened to phone calls, and that there was no
information pertaining to hits on AUSA Armijo, Special Agent Acee, or Judge
Browning during these interactions.

      So that shows clearly that the Government knew or was at least looking at
and investigating these issues and never disclosed them.

      Special Agent Acee also testified that one of the alleged threats occurred
when Mr. Martinez was in Santa Fe Correctional Center, the adult detention center.
He's not been there since March of 2020.  It's been a year, and none of this had
been disclosed to us, Your Honor.  That obviously would have been something that

_____

[11]A 302, or FD 302, is a document that the FBI uses to memorialize interviews.  See Trial
Tr. Day 3 at 184:10-16 (Harrison, Acee)(Harrison: "Now, to . . . talk about how you memorialize
your interviews, you produce what are colloquially called 302s; is that correct?" Acee:  "Yes, sir.
The form is FD 302, but attorneys and agents just call them 302s.  They're our reports.").

aided or guided the defense where we asked the question about the generic statements that Special Agent Acee made regarding threats to FBI and federal prosecutors.

And we would just submit, Your Honor, there are significantly more prejudicial . . . nondisclosures about cooperating witnesses or other instances, because the testimony here is threats against federal agents and federal prosecutors, which, you know, are much more revered and something much more alarming to a jury, to the average person, as we've talked about in previous instances . . . .

Based on that, Your Honor, we would just make our motion asking for a mistrial. In the alternative, if you disagree, we would ask that all of that be stricken from the record in this case for failure to disclose any of it before it was elicited on direct examination.

Trial Tr. Day 3 at 204:1-206:2 (Hart).

114. The Court asked why Martinez was prejudiced by the lack of disclosure:

Well, it sounds like it's an ongoing thing. It sounds like things occurred this morning and the last few days, and that happens in a trial. Tell me how, if it's ongoing and it's happening right now, how has it prejudiced you? I mean, it's one of those things that's kind of developing. How is it prejudicing you?

Trial Tr. Day 3 at 206:3-9 (Court).

115. Mr. Hart responded:

In two instances, Your Honor, one is Special Agent Acee testified that the Government was in possession of information regarding alleged threats that happened when Mr. Martinez was incarcerated in Santa Fe. It's been more than a year since he was incarcerated in Santa Fe. It certainly lends credence to the fact that the Government has had this information before this morning.

And also, Your Honor, as I stated -- and we can enter it into the record, if you'd like -- we did receive a 302 in discovery in February, last month, dated January 19, 2021, where Special Agent Stemo stated that she was listening to recordings. Now, she does not say that they're investigating threats. All she states is -- and this is a quote -- "It does not appear that any information pertaining to hits on AUSA Maria Armijo, SA Bryan Acee, or Judge Browning was exchanged during these interactions."

The Government knew that these existed. The Government was investigating it, but made no disclosure prior to Special Agent Acee testifying in this trial. That's prejudicial. We obviously would have approached this very differently. All of the instances of what is disclosed in trial and what is disclosed in discovery of any alleged threats against the Court, the FBI agents, or the federal

prosecutors in this case don't mention Mr. Martinez whatsoever. They all refer to prior threats from prior trials relating to Mr. Anthony Ray Baca, related to Pup.

So for this to come up for the first time in the middle of trial I think is a misrepresentation Your Honor. Or I shouldn't say misrepresentation. It's shading what's going on to say that we had no knowledge of this before today.

For example, Your Honor, we now have the warrant, which is more than 90 pages. Special Agent Acee testified that he was out arresting people this morning. I'm sure he didn't write this this morning. I'm sure he didn't write it just yesterday. There is a lot of investigative activity going on in here which we haven't even had a chance to review completely, because we've just been given it.

So based on that, Your Honor, that shows an ongoing -- it's not something that just came up this morning for the first time.

Trial Tr. Day 3 at 206:3-208:4 (Hart).

116. Mr. Castellano responded:

This is ongoing, as the Court noted. I don't know -- I think there is maybe information that we don't have that a taint team[12] might have in the office. Because anything dealing with the Defendant, because he's represented by counsel, wouldn't come to us. It would come to a taint team. But we don't get any information related to the Defendant or his counsel. And this morning, I did tell the Court and the parties that this was related to ongoing threats to a witness, and that was contained in the affidavit. I mean, I don't understand. I think they probably should have read the affidavit first, before asking questions about it. I didn't bring it up at all in court. I only asked him if he arrested people this morning. I didn't even say related to today. I said if you arrested people and recovered evidence of crime. That was it. And then they asked a further question, not knowing what was in the affidavit which we turned over to them. So I don't know what to say about that. It is ongoing, it was a sealed matter. It actually remains sealed now, and they are the only people who have this, other than the agent at this point. So it's ongoing.

Trial Tr. Day 3 at 208:8-209:8 (Castellano).

117. The Court stated that it was "going to deny the motion without prejudice." Trial

---

[12]A taint team is a group of Department of Justice ("DOJ") and FBI agents who are not part of a prosecution team and are assigned to review potentially privileged material seized in connection with a specific investigation. See, e.g., DOJ Creates Special Unit to Handle Privileged Documents, American Bar Association, https://www.americanbar.org/groups/litigation/committees/criminal/practice/2020/doj-creates-special-unit-to-handle-privileged-documents/ (last visited July 10, 2021).

Tr. Day 3 at 209:9-10 (Court).

118.    The Court explained that it was "having a . . . hard time" understanding why the

lack of disclosure was prejudicial:

> It's just part of trial work.  You've got stuff that's coming out in the middle of trial.
> . . . It sounds more like a Brady[13] disclosure issue, not really a mistrial issue.  I'm
> not seeing what the prejudice is, but I'm not precluding it if you want to make
> another run at me.

Trial Tr. Day 3 at 209:10-15 (Court).

**6.      The Journal Article's Reporting on the Threats.**

119.    On the third day of the evidentiary portion of trial, March 5, 2021, the Albuquerque

Journal published an article discussing Acee's testimony on the alleged threats.  See Colleen Heild,

Four    Arrested    Prior    to    Trial    of    SNM    'Soldier,"    Albuquerque    Journal,

https://www.abqjournal.com/2366515/four-arrested-prior-to-trial-of-snm-soldier.html    (last

visited July 5, 2021)("Journal Article").

120.    Heild reported:

> Just as testimony in the racketeering and murder trial of yet another member
> of the ultra-violent Syndicato de Nuevo Mexico prison gang was to begin this week
> in Albuquerque federal court, the FBI led an early morning raid to squelch threats
> made against a judge and others.
>
> . . . .
>
> During the first day of testimony in the trial of Jody Rufino Martinez, a self-
> admitted "soldier" for the SNM, lead FBI case agent Bryan Acee testified
> Wednesday that four people had been arrested just hours earlier.
>
> Under cross examination, Acee testified that Martinez of Truchas had been
> linked to two threats to kill FBI agents and prosecutors, including threats that have
> surfaced since Martinez has been incarcerated at the Cibola County Correctional

---

[13]In Brady v. Maryland, 373 U.S. 83 (1963)("Brady"), the Supreme Court of the United
States of America explained that "the suppression by the prosecution of evidence favorable to an
accused upon request violates due process where the evidence is material either to guilt or to
punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.

Center in Milan, west of Albuquerque.

Journal Article at 1.

121.     In the Journal Article, Heild did not connect the Court and the alleged threats: "When Harrison asked whether the new threats involved 'a judge's name,' Acee replied, 'yes,' but the judge wasn't identified."  Journal Article at 2 (no citation for quotation).

122.     The Court saw the article in the paper, scanned it to see if its name was mentioned, saw that its name was not in it, did not read every line, and moved on to the courtroom and the continuance of trial.

123.     The Court's scanning of the article did not alert the Court that Martinez was connected to the alleged threat on the Court.

### 7.     The Seriousness of the Threat.

124.     After Acee's testimony on the threats, the Court thought that all the men related to the threat on the Court where now in custody -- either they were already in custody or they had been arrested by the FBI on March 3, 2021.

125.     Because of the FBI arrests during trial, the immediate threat was mitigated.

126.     Thus, the Court thought the threat on it was over, and while the Court and the Marshals remain vigilant, there does appear to be a current threat.

127.     The seriousness of the threat was, in the Court's mind, reduced to zero at the precise moment that, Martinez contends, the Court learned of Martinez' ties to the alleged threat on the Court -- the morning of the first day of testimony.

128.     Martinez did not renew his motion for a mistrial again during trial and did not move for the Court to recuse itself until Martinez filed the Motion on April 13, 2021, twenty-eight days after trial.  See Trial Minutes at 1-28; Motion at 1-6.

129.     Now, after the Court held a hearing on the Motion and looking back at the Trial

Day 3 Tr., the Court is able conclude that although Acee did not explicitly state that Martinez was involved in the threat against the Court, see Trial Tr. Day 3 at 179:21 (Acee)(testifying that that Martinez had something to do with the threat at "one time"); Trial Tr. Day 3 at 180:4-13 (Acee), the Court can parse the testimony and realize that, read in context, Acee's testimony indicates that Martinez was part of the discussions to threaten the Court.

## PROCEDURAL HISTORY

The Court first discusses the Motion. The Court then discusses the United States' response, and Martinez' reply. Finally, the Court discusses the hearing on the Motion.

1.    **The Motion.**

In the Motion, Martinez argues: (i) the Court should grant a new trial under rule 33, because "[d]efense counsel were blindsided at trial by revelations that Mr. Martinez was supposedly involved in a plot to kill several federal officials, including this Court"; (ii) the Court should have recused itself during trial, because of Martinez' and the SNM's threats against the Court; and (iii) the Court should recuse itself from sentencing Martinez. Motion at 1, 4. Martinez argues that the connection between "Mr. Martinez and this plot was undisclosed in discovery, unlisted in the Court's 'prior bad acts' disclosure process, and disclaimed at a bench conference dedicated to Special Agent Acee's activities the morning of his testimony." Motion at 4. Martinez contends that the prejudice stemming from the lack of disclosure "was both illustrated and increased by a front-page article in the Albuquerque Journal on the subject." Motion at 4.

Next, Martinez argues the Court should have recused itself under Greenspan, where the United States Court of Appeals for the Tenth Circuit determined that a judge should have recused himself from sentencing and ultimately "'remand[ed] the case for resentencing by a different judge,'" where a defendant allegedly contributed money to pay a hit man to kill the judge presiding

over his case. Motion at 4 (quoting Greenspan, 26 F.3d at 1007). Martinez acknowledges that, under Greenspan, a defendant cannot manufacture recusal, but argues that where "'threat was not delivered in court or in connection with an official judicial proceeding involving this defendant'" the threat has the protentional to create a situation where the judge's impartiality might reasonably be questioned under 28 U.S.C. § 455. Motion at 4 (quoting Greenspan, 26 F.3d at 1006-7). Martinez argues that, although at the time he did not

> request that the Court recuse itself from the case -- although they did move for a mistrial, and at the time they had been given no evidence whatsoever regarding Mr. Martinez's connection to the threat -- this does not appear to have any impact on the standard of review to be applied by the Court.

Motion at 5. Martinez asks also that the Court recuse itself from sentencing. See Motion at 1.

### 2.     The Response.

The United States responds. See United States Sealed Response to Defendant's Sealed Motion for New Trial, filed May 11, 2021 (Doc. 279)("Response"). The United States argues that the Motion focuses only on whether the Court should recuse itself, and not on whether it should grant a new trial. See Response at 1. The United States asserts that courts have broad discretion to grant a new trial, but that courts disfavor granting new trials. See Response at 2 (citing United States v. Troutman, 814 F.2d 1428, 1455 (10th Cir. 1987), and United States v. Sinclair, 109 F.3d 1527, 1531 (10th Cir. 1997)). The United States contends that courts can weigh the evidence and assess witnesses' credibility under rule 33 of the Federal Rules of Civil Procedure. See Response at 3 (citing United States v. Quintanilla, 193 F.3d 1139, 1146 (10th Cir. 2009)).

The United States argues the Martinez does not explain adequately how any alleged prejudice from Acee's testimony about the threats satisfies the rule 33 standard. See Response at 4. The United States contends that, during the bench conference about Acee's testimony on March 3, 2021, the United States represented to the Court:

"[The arrests] have nothing to do with the defendant, and I have no objection to [Martinez' counsel] asking a little about it. Well, the stuff this morning relates to this case, but not directly to the Defendant. [It] relates to threats against a witness, and I didn't want to bring that out in front of this jury. I have no intention of doing so. It was a threat against a witness that we're trying to present and testify in this case, but I'm not bringing that out through -- obviously, and the later questions had to do with what you discussed in terms of whether or not the SNM was alive and well, whether or not they are largely a defunct organization. So it has to do with more than that, than Mr. Martinez in particular."

Response at 4-5 (quoting Transcript of Bryan Acee at 123:24-126:2, filed April 13, 2021 (Doc. 275-2)(Castellano)).

The United States contends that "a primary purpose of the warrant was to protect a potential witness who was listed on the Government's witness list for trial. The comments about the Defendant in the search warrant affidavit were for the purpose of establishing probable cause in support of that warrant." Response at 6. The United States argues that, in the Motion, "it is clear that defense counsel raised the issue regarding threats on his own in response to the 'Phase 3' reference on direct examination, and not in response to the Government's representations about the March 3, 2021 arrests." Response at 7 (no citation for quotation). The United States argues that Martinez does not establish how Acee's testimony satisfies rule 33's standard for a new trial, and the United States argues that the Court should deny the Motion for the same reasons as it did during trial. See Response at 7-8.

Next, the United States argues that the Court need not recuse itself from sentencing under § 455(a), because "the nature of the charges" -- a life sentence -- "restrict the Court's discretion regarding the sentence that it can impose." Response at 8. The United States argues, therefore, "a reasonable person, knowing all the relevant facts, would have no reason to question the Court's impartiality because the Court is without discretion to impose a sentence other than life in prison." Response at 9 (citing United States v. Hines, 696 F.2d 722, 728 (10th Cir. 1982)("Under section 455(a), the judge is under a continuing duty to ask himself what a reasonable person, knowing all

the relevant facts, would think about his impartiality.")).

### 3. The Reply.

Martinez argues that the United States misconstrues his rule 33 argument, because his argument is not that the verdict is contrary to the weight of the evidence; rather his "argument for purposes of his Motion for New Trial is that having a trial conducted by a judge who objectively speaking is not impartial (as contemplated by 28 U.S.C. § 455(a)) is the kind of injustice Rule 33 is designed to correct." Defendant's Sealed Reply to the United States' Sealed Response to Defendant's Sealed Motion for New Trial, filed June 1, 2021 (Doc. 287)("Reply"). Martinez contends that, under § 455(a), "'the judge's actual state of mind, purity of heart, incorruptibility, or lack of partiality are not the issue.'" Reply at 2 (quoting United States v. Cooley, 1 F.3d 985, 993 (10th Cir. 1993)). Martinez argues the inquiry into whether a judge should recuse is objective, and the "test is 'whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality.'" Reply at 2 (quoting United States v. Burger, 964 F.2d 1065, 1070 (10th Cir. 1992)). Martinez argues:

> [D]uring trial, it came to the Court's attention that Special Agent Acee applied for a search warrant and stated in that warrant that he "is aware certain members of the gang [SNM] have advocated for FBI agents, federal prosecutors, and the presiding federal judge to be harmed." See Doc. 275, Ex. A ¶ 20. The search warrant further states that "[o]ver the past several weeks, case agents have become aware of numerous threats aimed at government witnesses, federal prosecutors, FBI agents, and the presiding federal judge in the United States' case against the SNM." Id. ¶ 22. And the same search warrant affidavit states that the SNM "wanted to hit an FBI agent, prosecutor or judge if the opportunity presented itself, due to the RICO prosecutions of the gang." Id. ¶ 70. The alleged threat against the Court was reiterated later in the search warrant affidavit when Special Agent Acee alleged that SNM members, including Mr. Martinez "discuss[ed] the fact that a greenlight had been put on Bryan Acee, a federal judge, and an AUSA." Id. ¶ 127.

Reply at 3.

Martinez argues that his situation is analogous to the case in Greenspan, where a threat against a federal judge necessitated that the judge recuse, because "'it is obvious to us that a

reasonable person could question the judge's impartiality.'"  Reply at 4 (quoting <u>Greenspan</u>, 26 F.3d at 1007).  Martinez maintains that here, as in <u>Greenspan</u>, the threat was legitimate and not a ruse manufactured to obtain recusal.  <u>See</u> Reply at 4.  Martinez contends that "the Court was made aware during trial of an extrajudicial threat -- purportedly involving Mr. Martinez -- against the safety and wellbeing of the presiding judge," and therefore a reasonable person, knowing all the facts, could question the Court's impartiality.  Reply at 4.  Martinez argues that because the Court did not recuse itself, a new trial is warranted under rule 33.

Next, Martinez argues that, for similar reasons, the Court should recuse itself from sentencing.  <u>See</u> Reply at 5.  Martinez counters the United States argument that recusal is not warranted, because the Court does not have any discretion at sentencing, arguing: "[t]his argument . . . improperly conflates the impartiality of the decisionmaker with the outcome of his decision," in other words: "it is not a question of whether the sentence ultimately meted out is fair and just, but rather, whether a reasonable person would have an objective basis for questioning the impartiality of the sentencing judge."  Reply at 5.  Martinez argues that a threat against a judge's life is the reason to recuse under § 455(a).  <u>See</u> Reply at 5-6.

###  4.  **The Hearing**.

The Court held a hearing on the Motion.  <u>See</u> Transcript of Hearing at 1:24-2:4 (taken June 7, 2021)(Court)("Motion Tr.").[14]  The Court began the discussion by asking a question that "puzzles me" -- "tell me if I'm wrong, I didn't think Mr. Martinez was involved in any threat to kill anybody.  Am I missing something?  When that testimony came out, . . . and even when I read the briefs, I'm like, he's not involved in this."  Motion Tr. at 19:8-14 (Court).  Martinez responded

---

[14]The Court's citations to the transcript refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

that before trial, "in the tens of thousands of pages discovery" it was "very clear to us that there

was no evidence that Mr. Martinez was involved in any way." Motion Tr. at 19:16-19 (Hart).

Martinez then explained what had occurred:

> [W]hat happened was Special Agent [Acee] . . . testifies about arrests that were
> made related to the SNM case the morning that he came and testified.
>
> . . . .
>
> If you remember, Your Honor we came and had a long bench conference
> where we asked can we get disclosure on these arrests and during that bench
> conference Mr. Castellano said to the Court the only thing that that is about is
> witness intimidation . . . . It doesn't have to do you know with Mr. Martinez. And
> in fact, the Government's response where this is quoted, Mr. Castellano specifically
> says those arrests have nothing to do with the Defendant and I have no objection to
> him asking a little about it. So based on that representation, Mr. Harrison then
> asked Special Agent Acee the question of . . . "isn't it true that these threats that
> you talk about that Mr. Martinez was not involved in them at all regarding the
> judges Maria Armijo, an AUSA," and [then] Special Agent Acee testified that he
> was aware of two instances where Mr. Martinez was involved in threat[s] against
> them. . . . In fact, then on cross-examination, you know what Mr. Harrison then did
> to try to clean that up "well nothing ever came of that" and Special Agent Acee said
> "yes."
>
> And then what happened was we have a break and we get the hundred page
> warrant and I go back and [look] through it and I see that in that warrant there are
> allegations . . . from the affidavit prepared by Special Agent Acee that, while at the
> Cibola County Detention Center, . . . Rufino Martinez allegedly participated in
> discussions that included threats against the Court and the U.S. Attorney's office
> and at that point I also moved for a mistrial saying this information was not
> disclosed to us prior and based upon the testimony that was presented to the
> evidence and the Court denied that. So that portion of this regarding the testimony
> itself we think was properly preserved and was not the main focus of this motion,
> but there was testimony to the Court about there was testimony from Agent Acee
> about a threat against the Court, and there was this discussion, and I quoted from
> the warrant. There was this discussion that these threats that Special Agent Acee
> was alleging included alleged threats against the Court.

Motion Tr. at 19:22-21:19 (Hart). The Court stated that it

> didn't pick that up at all . . . . But of course, I didn't have a chance to look at that

affidavit.[15]  We were doing a lot of stuff during that.  I didn't have a chance to look
at it.  But I didn't, until you just said what you said I didn't think that there was any
. . . allegation that Mr. Martinez was involved in the threat.

Motion Tr. at 21:20-22:3 (Court).

Martinez argued that the record reflects that Acee's testimony and warrant discuss threats

against the Court.  See Motion Tr. at 22:4-23:8 (Hart).  The Court then stated that it had not seen

the Warrant's or the Acee Aff.'s contents, and that Martinez did not make a motion to recuse, so

the Court did not have the same information as the parties and did not know that Martinez was

linked to the threats, "so I couldn't have mentally thought about having to recuse myself and then

there was no motion to recuse.  So I don't see how we can really go back and kind of undo that

moment, do you?"  Motion Tr. at 23:9-20 (Court).  Martinez argued that he reads Greenspan as

imposing on the Court a continuing obligation to determine whether it must recuse itself.  See

Motion Tr. at 23:21-24 (Hart). The Court stated that it did not understand that Martinez was alleged

to be involved in the threat, so

either [that] escaped me or I never read the affidavit, which I think I've seen
portions of it now.  But I didn't pick up that it was, that he was being alleged to be
involved in those discussions, and nobody then pointed that out and said you need
to recuse yourself.  I don't know how the clock could sort of start on that.

. . . .

[T]he testimony did not link Martinez to [the threats].

Motion Tr. at 24:2-8 (Court).  Martinez disagreed, arguing that the testimony linked the threats to

Martinez:

We asked the question specifically: . . . "Isn't it true that Rufino Martinez was not
involved [in] any threats against the U.S. Attorney's office or judges," and Special
Agent Acee testified: "No, I'm aware of two threats, including a threat while he
was at the Santa Fe County Detention Center and a threat while he was at the Cibola

---

[15]The Court recalls that a court employee showed the Court briefly that a few pages of the
Acee Aff. made some reference to the Court, but the Court never read or examined closely the
Acee Aff.

County Detention Center."

Motion Tr. at 24:18-25 (Hart).  Martinez contended that part of his argument for a mistrial had

been based on the fact that the United States had not disclosed the alleged threats from when

Martinez was at the Santa Fe County Detention Center even though the threats allegedly had

happened over a year ago.  See Motion Tr. at 25:1-9 (Hart).  Martinez agreed that he did not move

the Court to recuse, but contended that the Court had its own obligation to determine whether it

needs to recuse.  See Motion Tr. at 25:14-26:5 (Hart).  Martinez stated that in the alternative, the

Court should recuse from sentencing.  See Motion Tr. at 26:2-5 (Hart).

The Court asked Martinez to address the United States' point that the Court does not have

any discretion at sentencing.  See Motion Tr. at 26:6-10 (Court).  Martinez agreed that the Court

did not have any discretion as to Count 1, which has a minimum life sentence, "but there is

discretion as to the other counts as the Government has said multiple times in this courtroom, even

in these cases, every count matters, even when there is jury within, when there is a mandatory

minimum life sentence, the RICO conspiracy doesn't have a mandatory life sentence."  Motion

Tr. at 26:11-18 (Hart).  Martinez agreed that, although Counts 2 and 4 have discretionary

sentences, those sentences will not "change the outcome of whether he's released."  Motion Tr. at

26:19-27:6 (Hart).

The United States responded and stated that Martinez relied heavily on statements from a

> sealed . . . search warrant . . . that was reviewed and signed by Judge Molzen on
> March 1 of this year.  At the time it was executed on . . . the morning of March 3,
> which was during the trial, it was still sealed. . . . [S]o at that point . . . the nature of
> the threats that were set forth within that search warrant . . . were not known . . . .

Motion Tr. at 27:12-28:17 (Ellison).  The United States argued that based on Acee's testimony and

the bench conference, the Court did not have sufficient knowledge to know that Martinez was part

of the alleged threats against the Court.

> I think that because of Your Honor's position in handling [related] cases it could be reasonably inferred but the nature of the threat was not disclosed. So it seems inconsistent . . . with respect to the timing for the defense to be able to rely on these statements that were within this sealed [affidavit] that had not yet been [reviewed] by the Court -- as the basis for saying that he has sufficient knowledge about the nature of the threats who was making them, to say that because of that under the § 455 standard . . . then Your Honor's impartiality could reasonably be questioned at that point in time from what [the Court] knew that morning of trial.

Motion Tr. at 29:10-23 (Ellison). The Court asked whether and when the testimony established a link between Martinez and the alleged threat. See Motion Tr. at 29:24-30:2 (Court). The United States said Martinez' question to Acee concerning whether Martinez was involved in the alleged threat only referenced the FBI agents, the federal prosecutor, and did not include a reference to a judge: "The questioning with respect to the judge didn't link it to Martinez. The one that linked it to Mr. Martinez was the question that related specifically to just FBI agents and federal prosecutors." Motion Tr. at 31:20-24 (Ellison). See Motion Tr. at 30:3-15 (Ellison). The United States argued that the

> important thing to remember is that, even under that Greenspan case, the judge has an obligation to not recuse himself just as much has he has an obligation to recuse himself, so our position in this case is that when you look at the record, when you look at what Your Honor knew at the time of trial that there was nothing that reasonably called Your Honor's impartiality into question, and with respect to the sentencing issue our position is as we outlined in the brief there is very little discretion especially always it relates to count two, and that a reasonable person could not infer any sort of impartiality based on . . . a sentence that the judge is without discretion to impose.

Motion Tr. at 32:3-17 (Ellison). Martinez replied and argued that the Court should not look at the questions "in a vacuum. It was very clear during the trial that the progression of the questions that we asked after the break bench conference regarding these issues was whether these threats that Special Agent Acee was talking about included Mr. Martinez." Motion Tr. at 33:2-13 (Hart).

The Court then asked Assistant United States Attorney Randy Castellano: "When we were up at the bench conference, did you think Mr. Martinez was involved." Motion Tr. at 34:14-17

(Court).  Mr. Castellano stated that "I thought that there" was a threat against "the Court, prosecutors, specifically Ms. Armijo," and that, "yes, I think that there was a chance that he was involved [in] prior threats that had been [going on] . . . ."  Motion Tr. at 34:18-24 (Castellano).

Mr. Castellano continued:

> Mr. Castellano:  [M]y representations at the bench were that the arrests that morning, which were on drugs and firearms charges, had nothing to do with the Defendant.  And . . . the other thing I recall from the Defense's line of questioning and in their own pleadings was that I said nothing about it [in] direct examination.  I asked no questions of Agent Acee about it, and then in their own pleadings filed during trial, I think Mr. Harrison said I moved off of that subject and then I asked independently about the threat to witnesses from Phase 3, and we had not tied the Defendant to Phase 3 whatsoever.  So the Defense on its own -- not through any prompting of us -- asked about whether or not Mr. Martinez was tied to threats.
>
> The Court:  What are you calling Phase 3?  The threat, is that the third phase?
>
> Mr. Castellano:  Yes.
>
> The Court:  So those takedowns that morning on the 3rd.
>
> Mr. Castellano:  That's correct Your Honor.  Phase 1 was December of 2014.  Phase 2 was . . . 2016.  And Phase 3 were the potential at least top people and that was what agent is a testified to about what Phase 3 was.  So the Defense on its own, like I said through no prompting by the Government, even in its own pleadings admitted that it then turned its questions to Phase 3 and then put that question to Agent Acee about threats involving Mr. Martinez. . . . .
>
> The Court:  Well, I guess it doesn't matter.  That's strategy between the two sides as to who brings it out and why they bring it out.  It just didn't -- I guess because I don't think I had ever read the affidavit -- I'll have to go back and look.  I think I was shown some portions of it, but I still didn't think anything about Mr. Martinez being involved.  My impression was Mr. Padilla, and then the four people that were arrested on the 3rd.  I thought, well, it's over, and at that time it didn't click that it involved Mr. Martinez at all.
>
> Mr. Castellano:  That wouldn't surprise me. Your Honor, the affidavit had been

| | |
|---|---|
| | submitted two days earlier. I don't think it was even entered on the docket. As a matter of fact, we represented to the Defense that this document in hand is basically a copy of the [Warrant and Acee Aff.]. It is the only copy of that document. |
| The Court: | And y'all gave it to them right there -- |
| Mr. Castellano: | We did. |
| The Court: | I don't think I -- I'll have to look in . . . our files, but I'm not sure I got a copy. |
| Mr. Castellano: | I'm fairly certaint[] the Court did not get a copy. We said we'd turn it over to the Defense; we asked them to guard it carefully because it was the only . . . copy out there; it wasn't even filed on the docket yet, because it was so recent; it was obtained on the first and executed on the third. So, there would have been really no time for the Court to review that document. As a matter of fact, I'm not sure the Court had access to it, because Judge Molzen is the one who reviewed and signed that document. |
| Mr. Hart: | I agree with that, Your Honor, but that's not what this motion is about. The motion is not about the affidavit. The motion is about what was said in the Courtroom. |

Motion Tr. at 34:14-37:6 (Castellano, Court, Hart).

The Court stated that Martinez had done evidently a good job with cross-examination that "I didn't pick . . . up" that Martinez was involved in the threats. Motion Tr. at 39:4-5 (Court). The Court stated that it "agree[s]" with Martinez that any references to the Court or Judge referred to the Court, even if the jury might not have been aware of the connection. Motion Tr. at 39:25-40:5 (Court). The Court stated:

| | |
|---|---|
| The Court: | But I guess the point is I just didn't link it up with Mr. Martinez. And we're in a trial [and] a lot of bullets are flying. You guys are objecting, making motions for mistrials and y'all have something I don't think I had, and that's the affidavit. . . . |
| Mr. Hart: | I agree. |
| The Court: | So that sort of clear language might have put it in context, but I was sitting there going, you know the guys are in custody, four got picked up today, it['s] over, and I just didn't link it up with Mr. Martinez. All the tools may have been there, I mean there might |

have been.

Motion Tr. at 40:7-19 (Court, Hart).

The Court concluded that it probably would not grant the motion for a new trial, but that it would give more thought to the sentencing issue, explaining:

> But I'm unlikely to grant it just because no motion to recuse was made and y'all had more information than I think I had. I'll go back and try to piece together what information I had at the time. But it escaped me that Mr. Martinez was being linked to this. I thought there was some people that had interests in some of the witnesses that were testifying, and that . . . was the big concern, and I . . . know knew my name was involved in those threats. But I didn't pick up that it was Mr. Martinez that was involved in those conversations and so I'm not likely to grant that motion for a new trial. But I will look at the portion of it that asks for a new sentencing Judge.

Motion Tr. at 42:5-21 (Court).

## LAW REGARDING MOTIONS FOR A NEW TRIAL

Rule 33 of the Federal Rules of Criminal Procedure provides:

**(a)**      **Defendant's Motion.** Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

**(b)**      **Time to File.**

    **(1)**      **Newly Discovered Evidence.** Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

    **(2)**      **Other Grounds.** Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

Fed. R. Crim. P. 33 (bold in original). Under rule 33, the district court has discretion to grant a new trial if the interests of justice require one. See Fed. R. Crim. P. 33(a). See also United States v. Quintanilla, 193 F.3d 1139, 1146 (10th Cir. 1999). "A motion for a new trial is not," however,

"regarded with favor and should only be granted with great caution." United States v. Sinclair, 109 F.3d 1427, 1531 (10th Cir. 1997)(citing United States v. Chatman, 994 F.2d 1510, 1518 (10th Cir. 1997)). "'[A] defendant may not invoke rule 33 when he or she has pled guilty.'" United States v. Christy, 883 F. Supp. 2d 1040, 1047 (D.N.M. 2012)(Browning, J.)(quoting United States v. Lambert, 603 F.3d 808, 809 (10th Cir. 1979)).

"The [United States Court of Appeals for the] Tenth Circuit has further stated that when 'deciding a motion for new trial, the [trial] court may weigh the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred.'" United States v. Thomas, No. 13-CR-01874 MV, 2016 WL 9819560, at *8 (D.N.M. Aug. 5, 2016)(Vázquez, J.)(quoting United States v. Evans, 42 F.3d 586, 593 (10th Cir. 1994)). "'The power to grant a new trial on the ground that the verdict is against the weight of the evidence should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.'" United States v. Guzman-Martinez, No. CR 03-2118 RB, 2004 WL 7338099, at *1 (D.N.M. March 10, 2004)(Brack, J.)(quoting United States v. Mounkes, 204 F.3d 1024, 1027 (10th Cir. 2000)).

The Court has previously addressed motions for new trials under rule 33 in various cases. See, e.g., United States v. Folse, No. CR 15-2485 JB, 2018 WL 6047415, at *20-22 (D.N.M. Nov. 19, 2018)(Browning, J.)(denying a motion for a new trial and a request for additional discovery where the defendant did not produce evidence that, with additional discovery, he could show that the United States destroyed evidence and, despite having earlier had notice that alleged deficiencies might exist in the United States' evidence, he did not seek evidence of such information); United States v. Neha, No. CR 04-1677 JB, 2006 WL 4062889, at *2-4 (D.N.M. June 26, 2006)(Browning, J.)(denying a new trial motion where the defendant complained of the

United States' brief references to his criminal history and of the United States' comment to the jury that the Court altered a co-conspirator's statement, and where the weight of the evidence supported the verdict).

Rule 33 permits a defendant to move for a new trial in the event of newly discovered evidence if the defendant presents that motion within three years of the verdict of guilt. See Fed. R. Crim. P. 33(b)(1). Ordinarily, a defendant seeking a new trial under rule 33(b)(1) must satisfy a five-part test for newly discovered evidence that the Tenth Circuit outlined in United States v. Sinclair. See 109 F.3d at 1531. The defendant must show that:

> (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

United States v. Sinclair, 109 F.3d at 1531 (internal quotation marks omitted)(quoting United States v. Stevens, 978 F.2d 565, 570 (10th Cir. 1992)). See United States v. Quintanilla, 193 F.3d at 1147 (discussing United States v. Sinclair's rule 33 test). See also United States v. Velarde, No. CR 98-391JB, 2008 WL 5993210, at *31-44 (D.N.M. May 16, 2008)(Browning, J.)(permitting a new trial in a sexual assault case where, after the trial, the defendant uncovered evidence that the alleged victim had accused other individuals of sexual assault). "Under Sinclair, a court cannot grant a new trial on the discovery of new impeachment evidence." United States v. Rodella, No. CR 14-2783 JB, 2015 WL 711931, at *33 (D.N.M. Feb. 2, 2015)(Browning, J.)(citing United States v. Sinclair, 109 F.3d at 1531).

## LAW REGARDING 28 U.S.C. § 455 RECUSAL

An important feature of the judicial system is that judges are fair and impartial arbiters of the disputes before them. 28 U.S.C. § 455(a) states: "Any justice, judge, or magistrate judge of

the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Certain listed circumstances also require a judge to recuse himself:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

28 U.S.C. § 455(b).

"'Under section 455(a), the judge is under a continuing duty to ask himself what a reasonable person, knowing all the relevant facts, would think about his impartiality.'" United States v. Greenspan, 26 F.3d 1001, 1005 (10th Cir. 1994)("Greenspan")(quoting United States v. Hines, 696 F.2d 722, 728 (10th Cir. 1982)). On the other hand, the Tenth Circuit has emphasized,

however, that "a judge has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require." Nichols v. Alley, 71 F.3d 347, 351 (10th Cir. 1995)(citing Greenspan, 26 F.3d at 1005; In re Am. Ready Mix, Inc., 14 F.3d 1497, 1501 (10th Cir. 1994); Hinman v. Rogers, 831 F.2d at 939). Thus, the recusal statute "must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." United States v. Hines, 696 F.2d 722, 729 (10th Cir. 1982). Moreover, the recusal "statute is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice." United States v. Cooley, 1 F.3d 985, 993 (10th Cir. 1993)(citing In re United States, 666 F.2d 690, 694 (1st Cir. 1981); United States v. Greenough, 782 F.2d 1556, 1558 (11th Cir. 1986)(per curiam)). See Advanced Optics Elecs., Inc., v. Robins, No. CIV 07-0855 JB/GBW, 2011 WL 1103830, at *4-5 (D.N.M. 2011)(Browning, J.)(concluding that recusal was not warranted where the Court had accounts with Wells Fargo, but Wells Fargo had no interest in the case).

Section 455(a)'s purpose is "to promote public confidence in the integrity of the judicial process." Liljeberg v. Health Servs. Corp., 486 U.S. 847, 859-60 (1988). "There are few characteristics of a judiciary more cherished and indispensable to justice than the characteristic of impartiality. Congress has mandated that justice must not only be impartial, but also that it must reasonably be perceived to be impartial." Greenspan, 26 F.3d at 1007 (citing 28 U.S.C. § 455(a)). "The test in this circuit is 'whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality.'" United States v. Cooley, 1 F.3d 985, 993 (10th Cir. 1993)(quoting (quoting Hinman v. Rogers, 831 F.2d 937, 939 (10th Cir. 1987)). "The standard is purely objective. The inquiry is limited to outward manifestations and reasonable inferences drawn therefrom. In applying the test, the initial inquiry is whether a reasonable factual basis

exists for calling the judge's impartiality into question." United States v. Cooley, 1 F.3d at 993 (emphasis in the original). A recusal determination is "'extremely fact driven.'" Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d at 659 (quoting Nichols v. Alley, 71 F.3d at 352). Close calls, however, are resolved in favor of recusal. See Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d at 659. See also Nichols v. Alley, 71 F.3d at 351 (emphasizing that "a judge has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require.")(citing Greenspan, 26 F.3d at 1005; In re Am. Ready Mix, Inc., 14 F.3d at 1501; Hinman v. Rogers, 831 F.2d at 939)).

Ordinarily "threats or attempts to intimidate a judge will not . . . satisfy the requirements for disqualification under section 455(a)." Greenspan, 26 F.3d at 1006 (citing United States v. Cooley, 1 F.3d 985, 993-94 (10th Cir. 1993)). See United States v. Dehghani, 550 F.3d 716, 721 (8th Cir. 2008)("Judges are not required to recuse themselves any time they are threatened."); United States v. Hairston, 38 F. App'x 884, 886 (4th Cir. 2002)(noting that "[w]hile a defendant's alleged death threat against a judge may, in some cases, sufficiently raise the specter of partiality to warrant the judge's recusal, recusal is not automatically required simply because the trial judge becomes aware of the threats."); United States v. Yu-Leung, 51 F.3d 1116, 1120 (2d Cir. 1995)("[D]espite [the judge's] knowledge of [the defendant's] alleged threat, we would be hard pressed to say that there exists the kind of basis . . . requiring the judge's recusal[.]"); Greenspan, 26 F.3d at 1006 ("This is not to say that all death threats against a judge will mandate that judge's recusal under Section 455."). A judge should not recuse if the threat is made as a ruse or to judge-shop. See United States v. Beale, 574 F.3d 512, 519 (8th Cir. 2009)("[D]efendants are not permitted to use such a plot or threat as a judge-shopping device.")(internal citations omitted); In re Basciano, 542 F.3d 950, 957 (2d Cir. 2008)("Requiring a judge to recuse himself because the

defendant, in an attempt to change judges, has plotted or threatened to kill the judge would provide any defendant who wanted a new judge with an effective, if in some cases dreadful, method to achieve that end. A defendant cannot be permitted to use such a plot or threat as a judge-shopping device."); Greenspan, 26 F.3d at 1006 ("As we have stated earlier, if a judge concludes that recusal is at least one of the defendant's objectives (whether or not the threat is taken seriously), then section 455 will not mandate recusal because that statute is not intended to be used as a forum shopping statute."); United States v. Cooley, 1 F.3d at 993 ("The statute is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice."); United States v. Owens, 902 F.2d 1154, 1156 (4th Cir. 1990)("Parties cannot be allowed to create the basis for recusal by their own deliberate actions. To hold otherwise would encourage inappropriate 'judge shopping.'").

In situations where the "threat is properly characterized as an 'extrajudicial source'" -- a "threat was not delivered in court or in connection with an official judicial proceeding involving this defendant" -- a threat can bring into question a judge's impartiality. Greenspan, 26 F.3d at 1006 (no citation for quotation). In Greenspan, the Tenth Circuit concluded that the sentencing judge should have recused, where the judge (i) "learned of an apparently genuine death threat made against him and against his family under circumstances that made it quite unlikely that the threat was intended as a device to obtain a recusal"; and (ii) "obviously took the threat very seriously, and chose to accelerate court procedures in order to reduce the risk to him and his family as he perceived it." Greenspan, 26 F.3d at 1007. Before sentencing, the judge was aware that the Federal Bureau of Investigation was looking into allegations that the defendant had conspired to kill him and his family, and that the "alleged conspiracy spanned several states and included a number of persons who had allegedly contributed large sums of money for the hiring of a 'hit man.'"

Greenspan, 26 F.3d at 1005 (no quotation for citation).  The judge had "expedited the hearing in order to 'get [the defendant] into the federal penitentiary system immediately, where he can be monitored more closely.'"  Greenspan, 26 F.3d at 1005 (quoting appellate record).  In addition, the judge took additional action and "refused to continue the sentencing hearing at the request of defendant's counsel, who had been appointed only two days before the expedited sentencing date." Greenspan, 26 F.3d at 1005.  Further, the United States, at oral argument on appeal, "conceded that a reasonable person might have questioned the judge's impartiality in light of the judge's knowledge that an investigation was being conducted into alleged threats against him by the defendant." Greenspan, 26 F.3d at 1006.  The Tenth Circuit concluded that there was "nothing in the record to suggest the threat was a ruse by the defendant in an effort to obtain a different judge," and held:

> In a case like the present, where there is no inference that the threat was some kind of ploy, the judge should have recused himself pursuant to section 455(a) and allowed another judge to sentence [the defendant].  Had there been any reason to believe that threats were made only in an attempt to obtain a different judge, to delay the proceedings, to harass, or for other vexatious or frivolous purpose, recusal would not have been warranted, even if the judge learned of the threats from a third person such as a federal agent.
>
> . . . .
>
> The bottom line here is that this judge learned of an apparently genuine death threat made against him and against his family under circumstances that made it quite unlikely that the threat was intended as a device to obtain a recusal.  The judge obviously took the threat very seriously, and chose to accelerate court procedures in order to reduce the risk to him and his family as he perceived it.  Under such circumstances, it is obvious to us that a reasonable person could question the judge's impartiality.  Even if this judge were one of those remarkable individuals who could ignore the personal implications of such a threat, the public reasonably could doubt his ability to do so.

Greenspan, 26 F.3d at 1006.[16]

[16]The United States Court of Appeals for the Second Circuit criticizes Greenspan:

> We are wary of the approach taken by the Tenth Circuit in Greenspan, which focused largely on the seriousness of the threat rather than the evidence of resulting bias. That would suggest that a person awaiting trial must mount not only a threat, but a serious one, in order to obtain a new trial judge. Even so, the Court noted that the threat at issue had apparently resulted in questionable actions taken by the trial court with respect to the sentencing of the defendant.

> > The trial [judge who was the subject of the defendant's threat] was aware of the allegations at the sentencing hearing, and in fact expedited the hearing in order to "get [the defendant] into the federal penitentiary system immediately, where he can be monitored more closely." [And] the trial court refused to continue the sentencing hearing at the request of defendant's counsel, who had been appointed only two days before the expedited sentencing date.

Greenspan, 26 F.3d at 1005.

> We should not be misunderstood as suggesting that the nature of a plot or threat is irrelevant. An idle malicious comment by a person awaiting trial is worlds away from a full-fledged conspiracy to assassinate a judge. We would expect the judicial behavior of a judge to be more likely to be affected by the latter than the former. It is, however, but one factor. The principal indicium of whether a judge's "impartiality might reasonably be questioned," we think, is whether judicial action subsequently taken by the judge with respect to the defendant in the wake of his or her discovery of the plot or threat does or does not appear to be impartial.

In re Basciano, 542 F.3d 950, 957 n.6 (2d Cir. 2008).

The Honorable Royce C. Lamberth, Chief United States District Judge for the District of Columbia, has described Greenspan's test as on focusing on the seriousness of the threat:

> The D.C. Circuit has addressed numerous cases involving § 455(a), but none involving a request for recusal based on a threat to the district judge. Where other Courts of Appeals have faced these scenarios, they have applied varying legal standards tailored to the unique circumstance involved. See, e.g., In re Basciano, 542 F.3d 950, 956 (2d Cir. 2008); United States v. Holland, 519 F.3d 909 (9th Cir. 2008); Greenspan, 26 F.3d 1001. In particular, while all of these Courts recognize that the seriousness of the underlying threat is a factor to consider in evaluating a § 455(a) motion, they disagree about the proper amount of weight to give it in the ultimate decision.

## ANALYSIS

Martinez raises two arguments: (i) that he is entitled to a new trial under rule 33 in the interests of justice, because the Court should have recused itself under 28 U.S.C. § 455(a) and Greenspan, when, on March 3, 2021, the first day of evidence at trial, Acee testified that Martinez allegedly was connected to a threat against the Court; and (ii) that the Court should recuse from sentencing Martinez under § 455(a) and Greenspan, because of the alleged threat, see Reply at 2-7.  Martinez argues that, under § 455(a), Martinez' connection to the alleged threat on the Court raises questions about the Court's impartiality.  See Motion at 1. Although the Court takes its § 455(a) duty seriously, the Court concludes that: (i) Martinez is not entitled to a new trial under rule 33, because: (a) the Court was not aware that Martinez was connected to the alleged threat

---

The Ninth and Tenth Circuits place significant emphasis on the seriousness of the underlying threat. In Greenspan, the Tenth Circuit said that "[t]he bottom line here is that this judge learned of an apparently genuine threat made against him . . . . The judge obviously took the threat very seriously, . . . . Under such circumstances, it is obvious to us that a reasonable person could question the judge's impartiality." Greenspan, 26 F.3d at 1007. Similarly, in Holland, the Ninth Circuit crafted a three-factor test focused on assessing "how much risk there is that [the threat] may be carried out and how much harm there would be if it were." Holland, 519 F.3d at 914–15.

The Second Circuit places less emphasis on the seriousness of the underlying threat.  It has held that while the seriousness of the underlying threat is a factor to consider, it is "wary of the approach taken by the Tenth Circuit in Greenspan, which focused largely on the seriousness of the threat rather than the evidence of resulting bias." In re Basciano, 542 F.3d 950, 957 (2d Cir. 2008). The Court worried that this emphasis "would suggest that a person awaiting trial must mount not only a threat, but a serious one, in order to obtain a new trial judge." Id. (emphasis in original). . . . .

Fortunately, the facts of this case make it unnecessary for this Court to decide between the two approaches.  For reasons explained below, regardless of the amount of emphasis one places on the underlying threat in this case, recusal is improper.

S.E.C. v. Bilzerian, 729 F. Supp. 2d 19, 22-23 (D.D.C. 2010)(Lamberth, C.J.).

until after trial when it held the hearing on the Motion; (b) the Court does not read <u>Greenspan</u> to create a per se rule that a judge must recuse when it becomes aware of a legitimate threat; (c) <u>Greenspan</u> is distinguishable, because the Court has not, and Martinez does not contend that the Court has taken any steps "to accelerate court procedures in order to reduce the risk [of the threat] to him" as the judge in <u>Greenspan</u> did and the threat is not as serious as the one in <u>Greenspan</u>; and (ii) the Court will not recuse from sentencing, because, <u>Greenspan</u> is distinguishable and the Court must sentence Martinez under Count I to life imprisonment, so there is no discretion as to what end result will be. Accordingly, the Court denies the Motion. In addition, the Court directs the United States to share this Memorandum Opinion and Order, and the briefing for the Motion, with its appellate lawyers and determine whether it will defend the Court's decision on appeal and not confess error.

I. **MARTINEZ IS NOT ENTITLED TO A NEW TRIAL UNDER RULE 33, BECAUSE, DURING TRIAL, THE COURT WAS NOT AWARE THAT MARTINEZ WAS CONNECTED TO THE ALLEGED THREATS; THEREFORE, GREENSPAN DOES REQUIRE THE COURT TO RECUSE.**

Martinez argues that he is entitled to a new trial under rule 33, because "the Court should have recused itself upon the disclosure of the fact that Mr. Martinez was allegedly involved in a threat on the Court's personal safety and wellbeing, pursuant to 28 U.S.C. § 455(a) and . . . <u>Greenspan</u>, 26 F.3d 1001 (10th Cir. 1994)." Reply at 1. Under rule 33, a district court has discretion to grant a new trial if the interests of justice require one. <u>See</u> Fed. R. Crim. P. 33(a). <u>See</u> <u>also</u> <u>United States v. Quintanilla</u>, 193 F.3d 1139, 1146 (10th Cir. 1999). "A motion for a new trial is not," however, "regarded with favor and should only be granted with great caution." <u>United States v. Sinclair</u>, 109 F.3d 1427, 1531 (10th Cir. 1997)(citing <u>United States v. Chatman</u>, 994 F.2d 1510, 1518 (10th Cir. 1997)).

Martinez argues that the alleged threat raises questions about the Court's impartiality and

these questions require the Court to grant a new trial in the interests of justice.  <u>See</u> Motion at 1.

Fairness and impartiality are integral  judicial values; § 455(a) provides: "Any justice, judge, or

magistrate judge of the United States shall disqualify himself in any proceeding in which his

impartiality might reasonably be questioned." 28 U.S.C. § 455(a).  Under § 455(a), therefore, "the

judge is under a continuing duty to ask himself what a reasonable person, knowing all the relevant

facts, would think about his impartiality.'"  <u>Greenspan</u>, 26 F.3d at 1005 (quoting <u>United States v.

Hines</u>, 696 F.2d 722, 728 (10th Cir. 1982)).   "The test in this circuit is 'whether a reasonable

person, knowing all the relevant facts, would harbor doubts about the judge's impartiality.'"

<u>United States v. Cooley</u>, 1 F.3d 985, 993 (10th Cir. 1993)(quoting <u>Hinman v. Rogers</u>, 831 F.2d

937, 939 (10th Cir. 1987)).  "The standard is purely objective.  The inquiry is limited to outward

manifestations and reasonable inferences drawn therefrom.  In applying the test, the initial inquiry

is whether a reasonable <u>factual</u> basis exists for calling the judge's impartiality into question."

<u>United States v. Cooley</u>, 1 F.3d at 993 (emphasis in the original).

Ordinarily "threats or attempts to intimidate a judge will not . . . satisfy the requirements

for disqualification under section 455(a)."  <u>Greenspan</u>, 26 F.3d at 1006 (citing <u>United States v.

Cooley</u>, 1 F.3d at 993-94).  <u>See</u> <u>United States v. Dehghani</u>, 550 F.3d 716, 721 (8th Cir. 2008);

<u>United States v. Hairston</u>, 38 F. App'x 884, 886 (4th Cir. 2002)("While a defendant's alleged death

threat against a judge may, in some cases, sufficiently raise the specter of partiality to warrant the

judge's recusal, recusal is not automatically required simply because the trial judge becomes aware

of the threats."); <u>United States v. Yu-Leung</u>, 51 F.3d 1116, 1120 (2d Cir. 1995).  For instance, if

the threat against the judge is a ruse or ploy to judge-shop, a judge should not recuse.  <u>See</u> <u>United

States v. Beale</u>, 574 F.3d 512, 519 (8th Cir. 2009)("[D]efendants are not 'permitted to use such a

plot or threat as a judge-shopping device.'")(quoting <u>In re Basciano</u>, 542 F.3d 950, 957 (2d Cir.

2008)); Greenspan, 26 F.3d at 1006; United States v. Cooley, 1 F.3d at 993; United States v. Owens, 902 F.2d 1154, 1156 (4th Cir. 1990).

Martinez argues that, here, the alleged threat is not an attempt to "have a veto power over the presiding judge, nor is he using Section 455(a) as a vehicle for obtaining a judge of his choice." Reply at 5. The Court agrees that nothing in the record suggests the alleged threats were made "only in an attempt to obtain a different judge, to delay the proceedings, to harass, or for other vexatious or frivolous purpose," or "that recusal is at least one of the defendant's objectives," Greenspan, 26 F.3d at 1006, because Martinez did not communicate the alleged threats to the Court and threats were not made during any judicial proceeding. Here, the Acee Aff. states the threats were made by several inmates -- SNM gang members and associates, including Martinez -- at the Cibola County Correction Center, who "discussed putting a green light on 'Acee, Armijo, and Browning,'[17] and "'lighting up the courtroom' when the case(s) went to trial." Acee Aff. at 5 (no citation for quotation). The threats therefore are properly classified, under Greenspan, as coming from an "'extrajudicial source,'" because the "threat was not delivered in court or in connection with an official judicial proceeding involving this defendant." Greenspan, 26 F.3d at 1006 (no citation for quotation). In Greenspan, the Tenth Circuit explained that legitimate extrajudicial source threats can raise questions about a judge's impartiality. See Greenspan, 26 F.3d at 1006. The Tenth Circuit concluded that the sentencing judge should have recused, because the judge, before sentencing the defendant after his guilty plea: (i) "learned of an apparently genuine death threat made against him and against his family under circumstances that made it quite unlikely that

---

[17]Footnote 7 of the Acee Aff. states: "FBI Special Agent Bryan Acee, Assistant U.S. Attorney Maria Armijo, and U.S. District Court Judge James Browning. " Warrant & Aff. ¶ 83 n.7, at 6.

the threat was intended as a device to obtain a recusal"; and (ii) "obviously took the threat very seriously, and chose to accelerate court procedures in order to reduce the risk to him and his family as he perceived it." Greenspan, 26 F.3d at 1007.

The Court concludes that, although nothing in the record shows that Martinez' threat was an effort to judge-shop, Greenspan is distinguishable, because: (i) the Court was not aware of the connection between Martinez and the threat until after trial; (ii) even if the Court had been aware of Martinez' threat, the threat is not as serious as the one in Greenspan, which involved a multi-state conspiracy to hire a hitman to kill the judge and his family; and (iii) the Court has not taken any actions to "accelerate court procedures in order to reduce the risk to" it, nor has Martinez alleged that to be true. Greenspan, 26 F.3d at 1007. Martinez bases his argument for a new trial under rule 33, § 455, and Greenspan on the assumption that the Court knew Martinez was connected to the alleged threats. See Reply at 4 ("In summary, the Court was made aware during trial of an extrajudicial threat . . . ."). The Court -- during trial -- however, did not make the connection that Martinez was involved in the alleged threats. The Court did not "learn" of the connection between Martinez and the alleged threats until after trial during at the hearing on the Motion on June 7, 2021, because during trial: (i) the United States represented that the arrests "relate[] to threats against a witness," but they "have nothing to do with the Defendant" and do not "relate . . . directly" to Martinez, Trial Tr. Day 3 at 155:12-16 (Castellano); (ii) the Court did not scrutinize closely the Acee Aff.,[18] which discusses the Martinez only in a couple paragraphs out of the ninety-eight pages: the Court understood that the Acee Aff. discusses threats, but did not

_____

[18]The CRD looked through the Acee Aff., but she also did not see that Martinez was connected to the alleged threats. The Court recalls that the CRD gave the Court a few highlighted pages that made reference to the Court, but the Court did not read all the capitalized names carefully and did not make the connection between Martinez and the threat.

make the connection that Martinez was involved in the threat on the Court; (iii) Acee's testimony on cross-examination did not explicitly link Martinez to threats against the Court, see Trial Tr. Day 3 at 179:17-187:12 (Acee);[19] (iv) Martinez moved for a mistrial because the United States' lack of disclosure was prejudicial, and not because the Court needed to recuse because of the threat; and (iv) trial, especially a trial taking place in March 2021 during the pandemic, is a fast-paced environment where the Court does not have the time and the brain power to sift through all the facts that the parties have at their disposal where the parties do not raise the issue. Perhaps, in hindsight, the Court should have made the connection, and paid more attention to all the details of the evidence and argument, but there was a lot of things coming at the Court trying a potentially month-long trial with COVID-19 protocols and it was focusing on the arrests that morning and the oral motion for a mistrial. The Court was focusing on the fact that the threat was apparently over with than the arrests that morning and all men involved were in now in custody. Also, there was no motion to recuse, only a motion for mistral. The Court is not criticizing Martinez for no raising the recusal issue, but if Martinez did not think about it, he can hardly criticize the Court for not raising the issue sue sponte. While Martinez probably did not expressly and consciously waive the issue in their first day of trial, as trial went on, waiver became more of reality with each passing day. The Court concludes that because the Court was not consciously aware of Martinez' connection to the threat, the Court could not evaluate whether it needed to recuse under § 455 and Greenspan. Cf. Greenspan, 26 F.3d at 1005 ("'Under section 455(a), the judge is under a

---

[19]Now, after the Court held a hearing on the Motion and looking back at the Trial Day 3 Tr., the Court is able conclude that although Acee did not explicitly state that Martinez was involved in the threat against the Court, see Trial Tr. Day 3 at 179:21 (Acee)(testifying that that Martinez had something to do with the threat at "one time"); Trial Tr. Day 3 at 180:4-13 (Acee), the Court can parse the testimony and realize that, read in context, Acee's testimony indicates that Martinez was part of the discussions to threaten the Court.

continuing duty to ask himself what a reasonable person, knowing all the relevant facts, would think about his impartiality.'")(quoting United States v. Hines, 696 F.2d 722, 728 (10th Cir. 1982)).

Second, even if the Court had connected the dots between Martinez and the threat from its quick look at portions of the Acee Aff. and from Acee's testimony on cross-examination, as Martinez argues the Court should have done, see Motion Tr. at 24:18-25 (Hart)(arguing that the testimony linked the threats to Martinez), the alleged threat do not rise to the level of seriousness in Greenspan. In Greenspan, the defendant allegedly "conspired to kill the trial judge or members of his family," and the conspiracy "spanned several states and included a number of persons who had allegedly contributed large sums of money for the hiring of a 'hit man.'" Greenspan, 26 F.3d at 1005 (no citation for quotation). The Tenth Circuit emphasizes the threat's seriousness: explaining that "threats or attempts to intimidate a judge will not ordinarily satisfy the requirements for disqualification under section 455(a)," but "[t]he bottom line here is that this judge learned of an apparently genuine threat made against him . . . . The judge obviously took the threat very seriously . . . . Under such circumstances, it is obvious to us that a reasonable person could question the judge's impartiality." Greenspan, 26 F.3d at 1005-6, 1007. See In re Basciano, 542 F.3d 950, 957 (2d Cir. 2008)(holding that, although the underlying threat's seriousness is a factor to consider, it is "wary of the approach taken by the Tenth Circuit in Greenspan, which focused largely on the seriousness of the threat rather than the evidence of resulting bias"). Here, although several SNM members "discussed putting a green light on" an FBI agent, an AUSA, and the Court, "and 'lighting up the courtroom' when the case went to trial," Acee Aff. ¶ 83, at 5-6 (no citation for quotation), to the extent that the Second Circuit is correct that Greenspan focuses on the threat's severity, from the Court's perspective, there effectively was

no threat at the time that Martinez says the Court should have perceived the threat, because all the men involved in the threat were and are in custody, see, e.g., United States v. Dehghani, 550 F.3d 716, 721 (8th Cir. 2008)(inquiring into the seriousness of the defendant's threat against the judge and the likelihood that the defendant would have been able to carry it out); United States v. Yu-Leung, 51 F.3d 1116, 1119-20 (2d Cir. 1995)(inquiring into the threat's seriousness in affirming the district court's denial of the defendant's motion to recuse); Evans v. U.S. Marshal Serv., No. 2:14-CV-1451, 2015 WL 1476654, at *5 (S.D. Ohio March 31, 2015)(Graham, J.)("'[C]ourts generally inquire into the seriousness of the threat, the motives behind the threat, and the totality of the circumstances under which the threat is made in determining whether recusal is necessary under § 455(a).'")(quoting United States v. Matusiewicz, No. CR 13-83-1-GMS, 2014 WL 4542775, at *2 (D. Del. Sept. 12, 2014)(Sleet, J.)); SEC v. Bilzerian, 729 F. Supp. 2d 19, 24 (D.D.C. 2010)(Lambeth, C.J.)(noting that "a threat to a judge, without more, does not ordinarily require recusal," and denying the defendant's motion because the death threat against the judge was not serious enough to warrant recusal).  In Greenspan, there was a multistate conspiracy to hire a "hit man" to target the sentencing judge and his family.  Greenspan, 26 F.3d at 1005. Here, by contrast, all men the Acee Aff. ¶ 83, at 45, mentions were and are in custody, and while the Court mistakenly thought, at the time, that the four arrests on Wednesday morning were related to the threat on the Court, with Acee's testimony, the Court thought that all men related to the threat on the Court where now in custody.  So, on that Wednesday morning, the Court thought that the threat was gone.  Thus the seriousness of the threat was, in the Court's mind, reduced to zero at the precise moment that, Martinez contends, the Court learned of Martinez' ties to the alleged threat on the Court -- the morning of the first day of testimony.

Third, Martinez does not allege that the Court has taken any action based on the threat that

raises questions about the Court's impartiality, nor has the Court done so.  See Motion at 1-6; Reply at 1-7.  The Court does not read Greenspan to mandate recusal anytime there is a serious threat; the Tenth Circuit emphasizes repeatably that it was the judge's "knowledge" of the serious threat plus the judge's decision to "accelerate[] the date of [the defendant's] sentencing." Greenspan, 26 F.3d at 1006.  The judge explained why he decided to accelerate sentencing: the judge wanted "to get [the defendant] into the penitentiary system as quickly as possible, and the trial court refused to grant a continuance of the sentencing hearing even though defendant's counsel had been appointed only two days before the sentencing date."  Greenspan, 26 F.3d at 1006.  The Tenth Circuit concluded that, in "the totality of the circumstances surrounding the sentencing hearing," the judge's decision to accelerate sentencing, along with the seriousness of the threat, "could have contributed to an appearance that the trial court was prejudiced against [the defendant]."  Greenspan, 26 F.3d at 1006.  Here, the Court has not taken, nor is there is a suggestion that the Court has taken, any action either to expedite trial proceedings to mitigate the threat that Martinez poses or rule against Martinez because of the alleged threat, and, under Greenspan, the mere specter of a serious threat, without more, is not sufficient reason for a court to recuse.  See Greenspan, 26 F.3d at 1006 (highlighting that the "trial court . . . accelerated the date of [the defendant's] sentencing, for the stated reason that the court wanted to get [the defendant] into the penitentiary system as quickly as possible," and the court "refused to grant a continuance of the sentencing hearing even though defendant's counsel had been appointed only two days before the sentencing date.").  Furthermore, any suggestion that the Court could have taken any action against Martinez because of the alleged threat holds little weight where the Court did not connect Martinez to the threat until after trial.  Cf. Greenspan, 26 F.3d at 1007  ("The bottom line here is that this judge learned of an apparently genuine death threat made against him and against his family[,] . . .

took the threat very seriously, and chose to accelerate court procedures in order to reduce the risk to him and his family as he perceived it.").

The Court, in sum, concludes that <u>Greenspan</u> is distinguishable for three reasons: (i) the Court was not aware of the connection between Martinez and the threat until after trial; (ii) Martinez' threat is not as serious as the one in <u>Greenspan</u>, where there was a multistate conspiracy to hire a hitman; and (iii) Court has not accelerated proceedings and Martinez does not allege that the Court has done so. <u>See Greenspan</u>, 26 F.3d at 1006 (noting that ordinarily "threats or attempts to intimidate a judge will not . . . satisfy the requirements for disqualification under section 455(a)")(citing <u>United States v. Cooley</u>, 1 F.3d at 993-94). Accordingly, the Court concludes that, under rule 33, it will not grant a new trial, because the Court's impartiality cannot be reasonably questioned. <u>See</u> 28 U.S.C. § 455(a); <u>United States v. Sinclair</u>, 109 F.3d at 1531 ("A motion for a new trial is not regarded with favor and should only be granted with great caution."); <u>Hinman v. Rogers</u>, 831 F.2d 937, 939 (10th Cir. 1987)("There is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is.").

**II.    THE COURT WILL NOT RECUSE FROM SENTENCING MARTINEZ, BECAUSE ITS IMPARTIALITY, KNOWING ALL THE FACTS, CANNOT REASONABLY BE QUESTIONED, WHERE (i) THE COURT DOES NOT HAVE ANY DISCRETION IN SENTENCING MARTINEZ TO LIFE UNDER COUNT 1; (ii) THE ALLEGED THREAT AGAINST THE COURT IS NOT AS SERIOUS AS THE THREAT IN <u>GREENSPAN</u>; (iii) AND MARTINEZ DOES NOT ALLEGE THAT THE COURT HAS TAKEN ANY ACTION AGAINST HIM BECAUSE OF <u>THE THREAT</u>.**

The next question is whether the Court, now that it is fully appraised of Martinez' involvement in the alleged threat against it, should recuse from sentencing Martinez. <u>See</u> Motion at 1; Reply at 5-7. The same standards under § 455(a) and <u>Greenspan</u> apply here as discussed in the Court's Analysis § I, <u>supra</u>. The factual distinction between recusal during trial, which the Court addresses above, and before sentencing, is that: (i) the Court now, unlike during trial, has

had a chance to examine closely Acee's trial testimony on Wednesday March 3, 2021, and the Acee Aff. and therefore, knows of Martinez' alleged threats against it; and (ii) the Court, under 18 U.S.C. § 1959(a)(1), lacks discretion at sentencing on Count 1, because it must sentence Martinez to life imprisonment. See 18 U.S.C. § 1959(a)(1); Notice of Intent Not to Seek a Sentence of Death, filed August 25, 2020 (Doc. 88)("Death Penalty Notice"). The Court concludes that a reasonable person, knowing all the facts, would not question its impartiality, because: (i) the Court does not have any discretion in sentencing Martinez to life imprisonment; (ii) Martinez' alleged threat against the Court is not as serious as in Greenspan; and (iii) Martinez does not allege that the Court has taken any action against him because of the threat.

The Court does not have discretion to sentence Martinez on Count 1, therefore "no reasonable person, knowing all the relevant facts, would think about his impartiality." United States v. Hines, 696 F.2d 722, 728 (10th Cir. 1982). See 28 U.S.C. § 455(a). See also 18 U.S.C. § 1959(a)(1). Under § 1959(a)(1), if a defendant commits Violent Crimes in Aid of Racketeering ("VICAR") murder, then the defendant "shall be punished . . . by death or life imprisonment, or a fine under this title, or both; and for kidnapping, by imprisonment for any term of years or for life, or a fine under this title, or both." 18 U.S.C. § 1959(a)(1). The United States is not seeking the death penalty. See Death Penalty Notice at 1. The jury found Martinez guilty on Count 1, VICAR, for first degree murder. See Verdict at 1, filed March 16, 2021 (Doc. 269). Accordingly, Martinez faces a mandatory minimum sentence of life in prison. Martinez argues that the Court's lack of discretion at sentencing is of no moment, because the Court's lack of discretion "improperly conflates the impartiality of the decisionmaker with the outcome of his decision. That is, it is not a question of whether the sentence ultimately meted out is fair and just, but rather, whether a reasonable person would have an objective basis for questioning the impartiality of" the Court.

Reply at 5. The Court, however, does not understand about what aspect of Martinez' sentence it could be partial or unfair if it must sentence Martinez to life imprisonment. At the hearing, although Martinez agreed that the Court did not have any discretion as to Count 1, Martinez argued that the Court has "discretion as to the other counts . . . , even in these cases, every count matters, even when . . . there is a mandatory minimum life sentence, the RICO conspiracy doesn't have a mandatory life sentence." Motion Tr. at 26:11-18 (Hart). Martinez agreed, however, that although Counts 2 and 4 have discretionary sentences, at those sentences will not "change the outcome of whether he's released." Motion Tr. at 26:19-27:6 (Hart). Every judge will give Martinez the same sentence for Count 1 regardless of a threat, and a life sentence for Count 1 means that the Court's sentences for the other counts will not change the outcome of when Martinez is released. Because Count 1 has a mandatory life sentence, and, even if the Court has discretion as to the other Counts, the Court concludes that a reasonable person knowing all the facts about the Court's lack discretion to sentence Martinez on Count 1 would not question the Court's impartiality.

Turning to Martinez' next argument, Martinez argues that the Court should recuse as the sentencing judge did in Greenspan. See Reply at 5. The Court concludes that Greenspan is distinguishable here for many of the same reasons the Court states in its Analysis § I, supra. Although the Court is now aware of the threat, the threat is not as serious as in the one in Greenspan, and Martinez does not argue that the Court has taken any adverse action against him because of the threat. In Greenspan, the Tenth Circuit emphasized the seriousness of the threat. See Greenspan, 26 F.3d at 1005-6, 1007 (highlighting the multi-state conspiracy to hire a hitman and that the "judge obviously took the threat very seriously . . . ."); In re Basciano, 542 F.3d at 957 (noting that Greenspan "focused largely on the seriousness of the threat rather than the evidence of resulting bias"). Here, the Court knew of a general threat by SNM members against it, but did

not connect Martinez to those threats until after trial on the hearing on the Motion.  Although the Court is now aware that the Acee Aff. alleges that several SNM members "discussed putting a green light on" an FBI agent, an AUSA, and the Court, "and 'lighting up the courtroom' when the case went to trial," Acee Aff. ¶ 83, at 5-6 (no citation for quotation), all the SNM gang members mentioned in ¶ 83 of the Acee Aff. are in custody, and since the threat was revealed on March 3, 2021, and the FBI arrests that morning, the Court thought the threat was mitigated.  In addition, the Martinez threat involved lighting up the courtroom during his trial and now that his trial is over, that threat is no longer pertinent.  See Acee Aff. ¶ 83, at 5-6.  The Court concludes Martinez' discussions with other SNM members to put a green light on the Court is not as serious a threat as a multi-state conspiracy to hire a hitman to target a judge and his family, because the discussions between the men in custody here do not reflect the same level of planning as what happened in Greenspan.  Although the Court takes is § 455(a) duty seriously, it concludes that the alleged SNM discussions do not rise to same level of seriousness as the threat in Greenspan, and, by itself, the alleged threat does not warrant recusal.

Third, even if the threat is still ongoing and equally serious, Martinez does not argue that the Court has accelerated sentencing proceedings or otherwise allege that the Court's actions have been distorted in response to the alleged threat.  See Motion at 1-6; Reply at 1-7.  In Greenspan, the Tenth Circuit looked at both the seriousness of the threat in addition to the sentencing judge's decisions to "accelerate[] the date of [the defendant's] sentencing" and deny "a continuance of the sentencing hearing even though defendant's counsel had been appointed only two days before the sentencing date." Greenspan, 26 F.3d at 1006.  Because Martinez makes no argument on this front and the Court has not accelerated sentencing proceedings, the Court concludes that a reasonable person knowing all the facts would not question the Court's impartiality in sentencing Martinez.

See 28 U.S.C. § 455(a); Greenspan, 26 F.3d at 1005-7. Accordingly, the Court will not recuse from sentencing Martinez.

**III. THE COURT DIRECTS THE UNITED STATES TO SHARE THIS MEMORANDUM OPINION AND ORDER, AND THE BRIEFING ON THE MOTION, WITH ITS APPELLATE LAWYERS AND DETERMINE WHETHER IT WILL DEFEND THE COURT'S DECISION ON APPEAL AND NOT CONFESS ERROR.**

The Court has done what the United States wants, and it has done the best it can to analyze the issues. The Court wants the assurance, however, that the United States' appellate lawyers not see a flaw in what the Court is doing and confess error at the Tenth Circuit. The Unites States should discuss this Memorandum Opinion and Order with its appellate lawyers, and send a letter to the Court stating what they will do and not do on appeal.

**IT IS ORDERED** that the Defendant's Sealed Motion for New Trial, filed April 13, 2021 (Doc. 275), is denied.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Fred J. Federici
    Acting United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Ryan Ellison
    Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

    *Attorneys for the Plaintiff*

Carter B. Harrison, IV
Nicholas Thomas Hart
Harrison & Hart, LLC
Albuquerque, New Mexico

*Attorneys for the Defendant*