# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

      Plaintiff,

vs.                                              No. CR  19-3725 JB

JODY RUFINO MARTINEZ,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Jody Rufino Martinez's Objections to the Presentence Report and Sentencing Memorandum, filed July 11, 2021 (Doc. 300)("Objections").   The primary issues are: (i) whether the Court can apply a 2-level sentencing enhancement pursuant to United States Sentencing Guidelines ("U.S.S.G") § 3A1.1(b)(1), because J. Martinez "knew or should have known that a victim of the offense," D.R., "was a vulnerable victim," where Mathew Martinez called a "green-light"[1] on D.R.; (ii) whether the Court can apply a 4-level enhancement pursuant to U.S.S.G. § 2A2.1(b)(1)(A) for the victim having suffered a permanent or life-threatening injury, because there is no evidence that the victim, D.S., has a permanent or life-threatening injury given only that the bullet is still in his leg; (iii) whether the Court can apply a 2-level enhancement pursuant to U.S.S.G. § 3C1.1 for J. Martinez' obstruction of justice during the investigation into D.S.'s shooting, because there is no evidence that J. Martinez concealed or destroyed evidence, and the fact that the alleged firearm and shell casing were not recovered is not sufficient for the enhancement's application; and (iv) whether the Court

---

[1]The United States Probation Office explains that putting a "green light" on someone means that person is "mean[t] . . . to be killed."  Addendum to the Presentence Report at 1, filed July 12, 2021 (Doc. 301).

can apply a 2-level enhancement pursuant to U.S.S.G. § 3B1.1(c) for J. Martinez being a leader, organizer, or manager in the shooting of D.S., because there is no evidence that more than one individual was involved in D.S.'s shooting or that J. Martinez exercised management responsibility within the SNM or over D.S.'s shooting.  The Court concludes (i) D.R. was not a vulnerable victim, because he was not especially susceptible to criminal conduct or in special need of protection; (ii) D.S. suffered a permanent injury, because the bullet from J. Martinez shooting him remains in his body; (iii) J. Martinez' did not obstruct justice, because he did not tamper with witnesses; and (iv) J. Martinez organized a green light on D.S., which demonstrates that he exercised an organizational role in the conspiracy.

## **FINDINGS OF FACT**

The Court's findings of fact are facts that the Court finds by a preponderance of the evidence.  See United States v. Williams, No. CR. 17-2556 JB, 2020 WL 4016108, at *6 (D.N.M. July 16, 2020)(Browning, J.)(citing United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)). Accord United States v. Zapata, 546 F.3d 1179, 1192 (10th Cir. 2008)("The district court's determination of drug quantity is a factual finding that must be supported by a preponderance of the evidence and is reviewed for clear error.").  The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard.[2]  See United States v. Banda,

---

[2]In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court held that the introduction of testimonial hearsay statements from witnesses not subjected to cross examination at trial violates a defendant's Sixth Amendment confrontation right.  See 541 U.S. at 68-69.  There is no binding precedent from the Supreme Court or the United States Court of Appeals for the Tenth Circuit concerning whether Crawford v. Washington applies to proceedings outside of the trial context.

The Tenth Circuit has indicated in unpublished caselaw that Crawford v. Washington does not bar hearsay statements at a suppression hearing.  In United States v. Ramirez, the Tenth Circuit notes:

168 F. App'x 284, 289 (10th Cir. 2006)(unpublished)[3](stating that "there is no prohibition on

> It is beyond reasonable debate that Ramirez's counsel were not ineffective in failing to make a Confrontation Clause challenge to the use of the confidential informant.  The Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay statements made in suppression hearings.  See United States v. Garcia, 324 Fed. App'x. 705, 708 (10th Cir. [2009]), cert. denied, [558] U.S. [890] . . . (2009)(collecting cases).  Nonetheless, even if we assume that the Confrontation Clause applies to the hearings at issue here, the admission of the confidential informant's statements was harmless.

388 F. App'x 807, 810 (10th Cir. 2010)(unpublished).  Moreover, based on the same reasoning as the Tenth Circuit in United States v. Ramirez, 388 F. App'x 807 (10th Cir. 2010)(unpublished), the Court has concluded that hearsay statements are admissible in a detention hearing.  See United States v. Hernandez, 778 F. Supp. 2d 1211, 1227 (D.N.M. 2011)(Browning, J.)("Before Crawford v. Washington, courts held that the Confrontation Clause did not attach to detention hearings.  Nothing in the Supreme Court's opinion in Crawford v. Washington undermines those holdings.  Moreover, what authority exists after Crawford v. Washington rejects the proposition that Crawford v. Washington applies outside of trial.").  Moreover, other Circuit Courts that have addressed this question have held that hearsay evidence's introduction at pre-trial proceedings does not violate the Confrontation Clause.  See Peterson v. California, 604 F.3d 1166 (9th Cir. 2010)(concluding that the admission of hearsay evidence at a preliminary hearing does not violate the Confrontation Clause because the right to confrontation is a trial right).  See also United States v. Mitchell-Hunter, 664 F.3d 45, 52 (1st Cir. 2011)(holding that the defendant did not have a confrontation right in a pretrial jurisdictional hearing).  Here, the Court largely relies on trial testimony to determine its factual findings.  To the extent that the Court relies on hearsay, the Court concludes that it does not violate J. Martinez' Confrontation right.

> [3] United States v. Banda is an unpublished opinion, but the Court can rely on an unpublished United States Court of Appeals for the Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

>> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

> United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Banda, United States v. Ramirez, United States v. Leroy, and United States v. Hendrickson have persuasive value with respect to a material issue and will assist the Court in its disposition of this MOO.

considering hearsay testimony at sentencing, provided it bears indicia of reliability").   The evidence and information upon which the Court relies must have sufficient indicia of reliability. See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

The Court recounts the General Background on the SNM Gang from its Memorandum Opinion and Order at 3-5, 2021 WL 2915110, at *2-4, filed July 12, 2021 (Doc. 303)("MOO"). The Court incorporates that recitation here.  Because the Court requires the United States Probation Office ("USPO") to base its factual statements in the Presentence Investigation Report on trial evidence rather than on pretrial discovery, the Court largely takes its facts from the Presentence Investigation Report, filed June 15, 2021 (Doc. 294)("PSR").  The PSR states, "On March 16, 2021, the defendant was found guilty by jury trial and the following offense conduct was provided by the U.S. Attorney's Office.  In addition, the trial transcripts were reviewed, and information was obtained from the FBI case agent."  PSR ¶ 14, at 8.  To the extent J. Martinez disputes the PSR's factual findings, the Court resolves these disputes from the jury trial held from March 1, 2021, to March 16, 2021.  See Clerk's Minutes at 1, filed March 1, 2021 (Doc. 265)("Trial Minutes").

     **1.**      **General Background on the SNM Gang.**

     1.      The SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including, murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics,

and firearms trafficking."   Superseding Indictment ¶ 1, at 1, filed December 11, 2019 (Doc. 33)("First Superseding Indictment").

2.      The SNM constitutes an enterprise "as defined in Title 18, United States Code, Sections 1959(b)(2) and 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which affected interstate and foreign commerce."   First Superseding Indictment ¶ 2, at 2.

3.      The enterprise is "an ongoing organization whose members/prospects/associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise."  First Superseding Indictment ¶ 2, at 1-2.

4.      The SNM is a prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM, during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage.  First Superseding Indictment ¶ 3, at 2.

5.      During the riot, thirty-three inmates were killed, and over 200 inmates were injured. See First Superseding Indictment ¶ 3, at 2.

6.      After the PNM riot, the SNM expanded throughout the State's prison system and has had as many as 500 members at one time.  See First Superseding Indictment ¶ 4, at 2.

7.      The SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members."  First Superseding Indictment ¶ 4, at 2.

8.      The SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system.  See First Superseding Indictment ¶¶ 3, 5, at 2-3.

9.      Members who rejoin their communities after completing their sentences are expected to further the gang's goals, primarily the control of, and the profit from, narcotics trafficking.  See First Superseding Indictment ¶ 5, at 3.

10.      Members who fail "to show continued loyalty to the gang" may be assaulted or murdered.  First Superseding Indictment ¶ 5, at 2-3.

11.      The SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities.  See First Superseding Indictment ¶ 6, at 3.

12.      If another gang does not abide by the SNM's demands, the SNM will assault or kill one of the other gang's members to show SNM's power.  See First Superseding Indictment ¶ 6, at 3.

13.      The SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See First Superseding Indictment ¶ 7, at 3.

14.      The SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others."  First Superseding Indictment ¶ 7, at 4.

15.      "Similarly, a member of the SNM Gang is expected to confront and attack any suspected law enforcement informants, cooperating witness[es], [gay people], or sex offenders." First Superseding Indictment ¶ 8, at 4.

16.      To achieve its purpose of maintaining power, the SNM uses intimidation, violence, threats of violence, assault, and murder.  See First Superseding Indictment ¶¶ 6-8, at 3-4.

17.     The SNM, as an enterprise, generates income by having its members and associates traffic controlled substances and extort narcotic traffickers.  See First Superseding Indictment ¶ 7, at 4.

18.     The SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department officials inspired the Federal Bureau of Investigation's present investigation.  See United States Notice of Related Cases, filed October 16, 2019 (Doc. 15).

**2.     Particular Facts with Respect to J. Martinez.**

19.     J. Martinez joined the SNM in June, 1998, while incarcerated in the New Mexico Corrections Department.  See PSR ¶ 26, at 10.

20.     In December, 1998, J. Martinez admitted his SNM membership to New Mexico Corrections Department officials, stated that he is a Soldier with the SNM, and possesses "an SNM tattoo of a Zia symbol with SNM in the middle."  PSR ¶ 27-28, at 10.

21.     On October 31, 1999, J. Martinez battered a corrections officer.  See PSR ¶ 29, at 10.

22.     In 2008, D.R. had an outstanding warrant for a probation violation and planned to surrender himself to the New Mexico Corrections Department to smuggle heroin into the jail and prison for SNM members.  See PSR ¶ 15, at 8.

23.     D.R. did not turn himself in, and instead consumed or sold the heroin.  See PSR ¶ 15, at 8.

24.     Because D.R. stole the heroin, J. Martinez and Matthew Martinez placed a "green light" on D.R.  PSR ¶ 15, at 8.

25.     On December 4, 2008, Rudy Salazar a.k.a. "Crip", a fellow SNM member, and J. Martinez picked up D.R. in Española, New Mexico, and drove to Chimayo, New Mexico.  See

PSR ¶ 16, at 8.

26.    "After doing drugs and talking for a little while," J. Martinez and M. Martinez confronted D.R. about the missing heroin.  See PSR ¶ 17, at 8.

27.    J. Martinez and M. Martinez directed Salazar, Jerome Cordova, and Paul Rivera a.k.a. "Oso", to assist in D.R.'s murder.  See PSR ¶ 17, at 8.

28.    Salazar strangled D.R. with a jumper cable wire while J. Martinez twisted D.R.'s head.  See PSR ¶ 17, at 8.

29.    M. Martinez laid on top of D.R., holding his arms and legs, while J. Martinez held D.R.'s head between J. Martinez' legs so D.R. could not defend himself.  See PSR ¶ 17, at 8.

30.    Once D.R. appeared to be dead, the participants removed all of D.R.'s clothing and items, and J. Martinez and M. Martinez instructed Salazar and Cordova to dispose of D.R.'s body.  See PSR ¶ 17, at 8.

31.    J. Martinez then instructed Salazar to stab D.R. in the neck.  See PSR ¶ 18, at 8.

32.    Before dumping D.R.'s body over a bridge into the Santa Cruz River in Chimayo, Salazar stabbed D.R. in the neck.  See PSR ¶ 18, at 8-9.

33.    D.R.'s body was found on December 5, 2008 in the Santa Cruz River.  See PSR ¶ 19, at 9.

34.    In 2018, J. Martinez and D.S. got into a fight at the Rio Arriba County Detention Center.  See PSR ¶ 35, at 11.

35.    On October 24, 2018, D.S. was at Joey Rodriguez' residence when J. Martinez came to the residence.  See 42, at 12.

36.    D.S. and J. Martinez argued about the fight they had while incarcerated, and J. Martinez wanted D.S. to go outside Rodriguez' residence to fight.  See PSR ¶ 42, at 12.

37.     J. Martinez went out to his car, grabbed a gun, walked back inside, and shot D.S. See PSR ¶ 42, at 12.

38.     D.S. sustained a gunshot wound to the right side of his groin area, impacting his pelvis.  See PSR ¶ 33, at 10-11.

39.     D.S. stated that the bullet "missed me by an inch and two centimeters by my artery, fractured my femur in two places, and I still have the bullet in me."  Draft Transcript of Trial, at 208:22-24 (taken March 8, 2021)(Salazar)("March 8 Tr.").[4]

40.     D.S. underwent surgery at the University of New Mexico hospital in Albuquerque, New Mexico.  See March 8 Tr. at 216:9-25 (Salazar, Armijo).

41.     Dr. MacArthur, a doctor at the University of New Mexico hospital, testified that D.S. presented with a broken pelvis and that the doctors elected not to remove the bullet inside D.S.  See Draft Transcript of Trial, at 177:16-178:3 (taken March 10, 2021)(MacArthur, Armijo)("March 10 Tr.").

42.     The bullet is still lodged inside D.S.'s body, and doctors told him they would not be removing it.  See PSR ¶ 41, at 12.

43.     D.S. told a detective from the Santa Fe County Sheriff's Office that "he was afraid to provide information about the shooting due to fear of retaliation."  PSR ¶ 34, at 11.

44.     In talking to D.S., however, the detective determined that J. Martinez was the suspected shooter.  See PSR ¶ 34, at 11.

45.     J. Martinez shot D.S., because of the altercation between the two of them while

---

[4]The Court's citations to the transcripts of the trial and sentencing hearing refers to the court reporter's original, unedited version.  Any final transcripts may contain slightly different page and/or line numbers.

they were incarcerated.  See PSR ¶ 35, at 11.

46.     When detectives took J. Martinez into custody, J. Martinez denied shooting D.S. See PSR ¶ 38, at 11.

47.     The firearm was a black semi-automatic.  See PSR ¶ 42, at 12.

48.     Detectives did not recover any firearms from J. Martinez' residence.  See PSR ¶ 39, at 11.

49.     J. Martinez' girlfriend, Santana Bustamante, told detectives that she had driven with J. Martinez to Rodriguez' house, but did not hear gunshots, because she was listening to music loudly in the car.  See PSR ¶ 40, at 12.

50.     Bustamante owned a .40 caliber Glock, but tried to report the firearm as stolen when law enforcement asked her about it.  See PSR ¶ 41, at 12.

51.     The firearm involved in the shooting has not been recovered.  See PSR ¶ 41, at 12.

52.     J. Martinez knowingly possessed a firearm after previously being convicted of felony offenses, including "Aggravated Battery with a Deadly Weapon, Battery Upon a Peace Officer, Attempt to Commit a Felony, to wit: Second Degree Murder, Attempted Robbery, Conspiracy, Resisting, Evading or Obstructing an Officer, Possession of a Controlled Substance to wit: Heroin, and Possession of a Controlled Substance to wit: Methamphetamine."  PSR ¶ 47, at 13.

53.     J. Martinez used a firearm in connection with another felony offense when he shot D.S.  See PSR ¶ 47, at 13.

54.     On December 12, 2019, while incarcerated at the Santa Fe County Adult Detention Facility, J. Martinez threatened physical force against another SNM member, J.L., to prevent J.L. from testifying against J. Martinez.  See PSR ¶ 44, at 12.

55.     J. Martinez said to J.L.: "'[H]ow could you go behind my back and say that I did do my crime in my case and that my chick brings me drugs. . . .  [Y]ou're nothing but a bi*** L. and a rat and you will get yours one day.'"  PSR ¶ 45, at 12 (quoting J. Martinez).

56.     J. Martinez also suggested that J.L. cooperated with authorities, and when J.L. asked J. Martinez about what he was talking, J. Martinez said: "'[Y]ou know what I am talking about.  You'll be there at my trial testifying against me.  You and four other informants. They said it all at Court so don't act stupid.  You know what I am talking about.'"  PSR ¶ 45, at 12-13 (quoting J. Martinez).

57.     While incarcerated in the Santa Fe County Adult Detention Facility in October 2019, J. Martinez placed a green light on D.S. and intended to have D.S. killed.  See PSR ¶ 54, at 13.

## PROCEDURAL HISTORY

On August 23, 2019, the United States filed the Criminal Complaint (Doc. 1)("Complaint").  In the Complaint, the United States alleges that J. Martinez violated 18 U.S.C. § 922(g)(1): Felon-in-Possession of a Firearm.  See Complaint at 1.  J. Martinez was arrested on September 19, 2019.  See Arrest Warrant Returned Executed, filed September 19, 2019 (Doc. 7). A federal grand jury charged J. Martinez with violating 18 U.S.C. §§ 922(g)(1) and 924: Felon-in-Possession of a Firearm and Ammunition.  See Indictment at 1, October 16, 2019 (Doc. 16). J. Martinez pleaded not guilty at his arraignment.  See Clerk's Minutes at 1, filed October 23, 2019 (Doc. 19).  On December 11, 2019, the United States filed the First Superseding Indictment, charging J. Martinez with two counts: (i) Count 1, violation of 18 U.S.C. § 1962(d): Racketeering Conspiracy; and (ii) Count 2, 18 U.S.C. §§ 922(g)(1) and 924: Felon-in-Possession of a Firearm and Ammunition.  See Superseding Indictment at 1-12, filed December 11, 2019 (Doc. 32)("First

Superseding Indictment").  On January 9, 2020, the United States filed the Second Superseding

Indictment, charging J. Martinez with an additional two counts, for a total of four counts: (i) Count

1, 18 U.S.C. § 1959(a)(1):  Violent Crimes in Aid of Racketeering (Murder) and 18 U.S.C. § 2:

Aiding and Abetting; (ii) Count 2, 18 U.S.C. § 1962(d): Racketeering Conspiracy; (iii) Count 3,

18 U.S.C. § 1512: Witness Tampering; and (iv) Count 4, 18 U.S.C. §§ 922(g)(1) and 924: Felon-

in-possession of a Firearm and Ammunition.  See Second Superseding Indictment at 1, filed

January 9, 2020 (Doc. 56).

The Court held a jury trial starting March 1, 2021, and ending March 16, 2021.  See Clerk's

Minutes at 1, filed March 1, 2021 (Doc. 265)("Trial Minutes").  The jury found J. Martinez guilty

of Counts 1, 2, and 4, but not guilty of Count 3.   See Verdict at 1-3, filed March 16, 2021 (Doc.

269).  Specifically, the jury found that J. Martinez was: (i) guilty "of violent crimes in aid of

racketeering in the murder of David Romero, as charged in Count 1 of the Second Superseding

Indictment" and that J. Martinez had "committed first degree murder"; (ii) guilty "of racketeering

conspiracy, as charged in Count 2 of the Second Superseding Indictment" and that "J. Martinez

. . . committed first degree murder of [D.R.] as part of the racketeering conspiracy"; (iii) not guilty

"of tampering with a witness by physical force or threat, as charged in Count 3 of the Second

Superseding Indictment"; and (iv) guilty "of felon in possession of a firearm or ammunition, as

charged in Count 4 of the Second Superseding Indictment."  Verdict at 1-3.

    **1.**     **The PSR.**

The USPO filed the PSR on June 15, 2021.  See PSR at 1.  For Count 1, the USPO

calculates that J. Martinez' base offense level is 43 under U.S.S.G. § 2E1.3.  PSR ¶ 62, at 16.  The

USPO adds eight levels for a total adjusted offense level of 51: (i) a 2-level vulnerable victim

adjustment under U.S.S.G. § 3A1.1(b)(1), because J. Martinez put a green-light on D.R.; (ii) a 2-

level victim related adjustment under U.S.S.G. § 3A1.3, because D.R was restrained; (iii) a 2-level adjustment under U.S.S.G. § 3A1.1(c), because J. Martinez "was an organizer, leader, manager, or supervisor in any criminal activity," U.S.S.G. § 3B1.1(c); and (iv) a 2-level adjustment under U.S.S.G. § 3C1.1, because J. Martinez obstructed justice.  PSR ¶¶ 62-68, at 16.  Because there are multiple counts, the USPO calculates that Count 1 is the highest offense level -- 51 -- under U.S.S.G. §§ 2E1.1, 3D1.4(a), (b), and (c).  See PSR ¶¶ 69-89, at 16-19.  Accordingly, under U.S.S.G. Chapter 5, the USPO converts the offense level from 51 to 43, because, "in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43."  PSR ¶ 91, at 19 (citing U.S.S.G. Ch. 5, Pt. A, cmt. n.2).

Next, the USPO calculates J. Martinez' subtotal criminal history score of 29 and adds 2 points, because J. Martinez "committed the instant offense while under a criminal justice sentence for" other offenses.  PSR ¶ 106, at 26 (citing U.S.S.G. § 4A1.1(d)).  The USPO therefore calculates J. Martinez' criminal history category as VI.  See PSR ¶¶105-109, at 26.  The USPO states that the statutory term of imprisonment for: (i) Count 1 is mandatory life without release or death, see 18 U.S.C. § 1959(a)(1); (ii) Count 2 is life, see 18 U.S.C. § 1962(d); and (iii) Count 4 is a minimum term of 15 years and a maximum term of life, see 18 U.S.C. §§ 922(g)(1), 924.  See PSR ¶ 155, at 37.  The USPO states that the guideline for a total offense level of 43 and a criminal history category of VI is life imprisonment..  See PSR ¶ 156, at 37.  The USPO states that, for each count, the guideline range for a term of supervised release is 2 to 5 years.  See PSR ¶ 160, at 37.  The Court scheduled sentencing for July 12, 2021.  See Minute Order, filed June 9, 2021 (Doc. 293)(text only).

### 2.   **The Objections**.

On July 11, 2021, the day before sentencing was scheduled, J. Martinez raised four

Objections to the PSR.  See Objections at 1.  First, J. Martinez objects to PSR ¶ 64, at 16, where the USPO concludes that D.R. was a vulnerable victim under U.S.S.G. § 3A1.1(b)(1).  See Objections at 2.  J. Martinez argues that D.R. was not a vulnerable victim, drug use alone does not make a person a vulnerable victim, and that there is no evidence that D.R was given drugs to make him vulnerable.  See Objections at 2 (citing United States v. Harbison, 523 F. App'x 569, 578 (11th Cir. 2013)(concluding that, under § 3A1.1, "it is appropriate to consider: 1) the victim's history of drug use and/or drug addiction; 2) the defendant's awareness of the victim's drug addiction; and 3) the victim's age. . .").  J. Martinez argues that "there should . . . be some type of targeting or action taken because of the vulnerable status before the enhancement may be applied." Objections at 2.

Second, J. Martinez objects to PSR ¶ 72, at 17, where the USPO concludes that D.S. suffered permanent or life-threatening injury under U.S.S.G. § 2A2.1(b)(1)(A), because J. Martinez shot D.S. in the leg.  See Objections at 3.  J. Martinez argues that "there was no evidence presented at the trial regarding the injuries suffered by D.S. or that D.S.'s life was in danger because of the alleged shooting."  Objections at 3.  J. Martinez contends that, even though the bullet remains in D.S.'s leg, "there is no indication that the presence of the bullet causes D.S. any permanent or life-threatening injury, or has resulted in any deformity that would merit the application of this enhancement."  Objections at 3 (citing with a "but see" United States v. Miner, 345 F.3d 1004, 1006 (8th Cir. 2003)(concluding that "the presence of a bullet inside [a victim's] body supports the permanent injury enhancement of U.S.S.G. § 2A2.1(b)(1)(A)").

Third, J. Martinez objects to PSR ¶ 76, at 17, where the USPO concludes that the base offense level should be enhanced by  two levels, because J. Martinez obstructed justice during the investigation into D.S.'s shooting.  See Objections at 3.  J. Martinez contends that, "at the trial for

this case, there was testimony that Mr. J. Martinez denied shooting D.S., but a denial to a law enforcement officer is not sufficient for the enhancement to apply," and that there is no evidence that J. Martinez concealed or destroyed any evidence.  Objections at 4.

Fourth, and last, J. Martinez objects to PSR ¶ 81, at 18, where the USPO concludes that J. Martinez was a leader, organizer, or manager under U.S.S.G. § 3B1.1(c).  See Objections at 5. J. Martinez argues that no evidence at trial shows that he had a leadership position or that D.S.'s shooting is related to any SNM activity.  See Objections at 5.  J. Martinez contends that "the evidence presented at trial was that Mr. J. Martinez was a soldier of the SNM and that while he was considered for a leadership position several years prior to the alleged shooting, he was not given that leadership position."  Objections at 5.

### 3.    The PSR Addendum.

Before sentencing, the USPO responded to the Objections.  See Addendum to the Presentence Report, filed July 7, 2021 (Doc. 301)("PSR Add.").  First, the USPO argues that D.R. was a vulnerable victim, because J. Martinez and M. Martinez put a "green light" on D.R., which meant D.R. was to be killed.  PSR Add. at 1.  The USPO argues that, when J. Martinez and M. Martinez put a green light on D.R., D.R. became a vulnerable victim, because he "became susceptible to injury or death."  PSR Add. at 1.  Second, the USPO argues that J. Martinez' citation to United States v. Miner, 345 F.3d 1004, supports the USPO's conclusion that D.S. has suffered a permanent injury, because the United States Court of Appeals for the Eighth Circuit concluded that "'the presence of a bullet inside [the victim's] body supports the permanent injury enhancement of U.S.S.G. § 2A2.1(b)(1)(A).'"  PSR Add. at 2 (quoting United States v. Miner, 345 F.3d at 1006).  Third, the USPO contends that, "on October 24, 2018, the defendant did attempt to intimidate L.L. and try to persuade the witness not to cooperate with law enforcement about the

shooting incident of D.S." PSR Add. at 2. The USPO argues that J. Martinez' girlfriend also retaliated against D.S. for cooperating with law enforcement. See PSR Add. at 2. Fourth, the USPO states that J. Martinez misapprehends the reasons behind the 2-level enchantment under U.S.S.G. § 3B1.1(c), because the enhancement relates to J. Martinez placing a green light on D.S. in October, 2019, and does not relate to J. Martinez shooting D.S. on October 24, 2018. See PSR Add. at 3. The USPO argues, "[b]ecause the defendant ordered the 'green light' on D.S., he is considered to have an aggravating role in this act." PSR Add. at 3 (no citation for quotation).

4.     **The Sentencing Hearing**.

The Court held a hearing on July 12, 2021. See Clerk's Minutes at 1, filed July 12, 2021 (Doc. 305). At the hearing, the parties argued on the Objections. See Draft Transcript of Hearing at 4:20-24 (taken July 12, 2021)(Court)("July 12 Tr."). First, J. Martinez argued that D.R.'s drug use did not render him a vulnerable victim, because everyone in the house at the time of D.R.'s murder was using drugs. See July 12 Tr. at 6:2-9 (Hart). J. Martinez further argues that the vulnerable victim enhancement should apply only when a victim is given drugs specifically to render him more vulnerable, and that the Court should consider D.R.'s history of drug use and addiction in considering the enhancement's application. See July 12 Tr. at 6:9-23 (Hart). J. Martinez also contends that the green light on D.R. is insufficient to render him a vulnerable victim, because the enhancement's application is meant to apply only where "they targeted specifically that person because the victim was vulnerable and that's not present in this case." July 12 Tr. at 7:11-13 (Hart). In response, the United States argued that D.R. was enticed by the drug usage to come to the house where he eventually was killed. See July 12 Tr. at 8:13-17 (Armijo). Further, the United States argued that D.R. was a vulnerable victim, because he was held down and was in a small room with many people attacking him. See July 12 Tr. at 8:21-9:18 (Armijo).

Next, the United States conceded that it would not oppose J. Martinez' third Objection to the 2-level enhancement for obstruction of justice.  See July 12 Tr. at 10:5-8 (Armijo).  The United States contended that the Objection is based on Lisa Lowe and Santana Bustamante's statements that J. Martinez threatened them.  See July 12 Tr. at 10:16-25 (Armijo).  The United States conceded, however, that both Lowe and Bustamante later told the United States that J. Martinez did not threaten them.  See July 12 Tr. at 10:16-11:1 (Armijo).  The USPO stated that the Court should apply the enhancement.  See July 12 Tr. at 14:12-14 (USPO).  J. Martinez argued that there were only allegations that J. Martinez threatened Lowe and Bustamante, but there was never any evidence presented on these allegations beyond the indictment.  See July 12 Tr. at 15:18-16:8 (Hart).

J. Martinez also argued about his Objection to the 4-level enhancement for causing a permanent or life-threatening injury.  See July 12 Tr. at 11:23-12:1 (Hart).  J. Martinez contended that the only evidence presented about D.S.' injury indicates that there is an object in his leg, but there has never been any evidence that his life was ever at risk or that D.S. is permanently deformed, and therefore, there is not enough evidence to conclude that D.S. suffered a permanent or life-threatening injury.  See July 12 Tr. at 12:1-16 (Hart).  J. Martinez argued that the bullet's presence in D.S.'s body is not enough to justify the enhancement.  See July 12 Tr. at 13:2-6 (Hart).  The United States responded, arguing that D.S. testified that the bullet caused him excruciating pain, and his life was in danger because he spent several days in the hospital following the shooting.  See July 12 Tr. at 13:9-14:1 (Armijo).  The Court indicated that it was inclined to overrule J. Martinez' Objection to the 4-level enhancement.  See July 12 Tr. at 14:5-6 (Court).

J. Martinez argued his final Objection to the 2-level enhancement for having a leadership or organizing role.  See July 12 Tr. at 17:13-15 (Hart).  J. Martinez argued that this was another

allegation in the indictment that the United States did not prove at trial, and the Court should not apply the enhancement, because there were not multiple people involved in D.S.'s shooting, and there is no evidence that J. Martinez was involved in the property or management of SNM's assets. See July 12 Tr. at 18:12-19:2 (Hart).  The United States argued that J. Martinez was acting as a leader within the SNM by "taking initiative" and shooting D.S. after D.S. disrespected him.  July 12 Tr. at 20:2-8 (Armijo).  J. Martinez responded, arguing that, absent specific evidence, it was not enough to conclude that J. Martinez shot D.S. on behalf of the SNM only because J. Martinez was a part of the SNM.  See July 12 Tr. at 21:19-25.

    **5.**    **The Second PSR Add.**

Following the hearing, the USPO filed its Second Addendum to the Presentence Report on July 14, 2021 (Doc. 304)("Second PSR Add.").  In the Second PSR Add., the USPO notes that it conferred with the United States and determined there was insufficient evidence to conclude that J. Martinez obstructed justice.  See Second PSR Add. at 1.  Accordingly, the USPO removed the 2-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1.  See Second PSR Add. at 1.  The Court agrees with the USPO, and concludes that U.S.S.G. § 3C1.1's 2-level enhancement does not apply.

## LAW REGARDING THE SENTENCING GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making the Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past,

in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . .  shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the offense's nature and the nature of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing.   See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.  See Rita v.

United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted)(quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006)).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349, as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251, n.3 (10th Cir. 2008).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Rita v. United States, 551 U.S. at 351.  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[5] Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States,

---

[5]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the resulting Guidelines ranges are advisory.  Gall v. United States, 552

U.S. at 46 ("As a result of our decision [in <u>United States v. Booker</u>], the Guidelines are now advisory . . . ."); <u>United States v. Leroy</u>, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); <u>United States v. Sells</u>, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."). The Court must consider the Guidelines, see <u>Gall v. United States</u>, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see <u>Gall v. United States</u>, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range. See <u>United States v. Sierra-Castillo</u>, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-<u>Booker</u> have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord <u>United States v. Chavez-Rodarte</u>, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in <u>United States v. Booker</u> that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in <u>Kimbrough v. United States</u> that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their <u>United States v. Booker</u>-granted authority to post-Guidelines analysis "variances." <u>Irizarry v. United States</u>, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See <u>Gall v. United States</u>, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally

552 U.S. at 46-47; <u>Kimbrough v. United States</u>, 552 U.S. at 90-91.

> While the Supreme Court's decision in <u>United States v. Booker</u> has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-Guideline sentence. Thus, before the sentencing court takes up a defendant's <u>Booker</u> arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the <u>Booker</u> calculus, even if the court does not grant a downward departure.

<u>United States v. Apodaca-Leyva</u>, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court has recognized, however, that sentencing judges are "in a superior position to find facts and judge their import under § 3553(a) in each particular case." <u>Kimbrough v. United States</u>, 552 U.S. at 89. Applying § 3553(a)'s factors, the Court has concluded that the case of an illegal immigrant who re-entered the United States to provide for his two children and two siblings was not materially different from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted. <u>See</u> <u>United States v. Almendares-Soto</u>, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.). On the other hand, in <u>United States v. Jager</u>, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court concluded that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the

---

> reasonable if "the district court committed no significant procedural error, <u>such as failing to calculate (or improperly calculating) the Guidelines range</u>, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

> <u>United States v. Nolf</u>, 30 F. Supp. 3d 1200, 1222-24, (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction."
2011 WL 831279, at *14.

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment *within the range* prescribed by statute."  530 U.S. at 481 (emphasis in original).  The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. at 490.  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*."  Blakely v. Washington, 542 U.S. at 303 (emphasis in original)(citing Ring v. Arizona, 536 U.S. 584, 602 (2002); Harris v. United States, 536 U.S. 545, 563 (2002)(plurality opinion), overruled by Alleyne v. United States, 570 U.S. 99 (2012)).  In United States v. Booker, however, the Supreme Court held that, because the sentencing guideline ranges are no longer mandatory, "*Apprendi* does not apply to the present advisory-Guidelines regime."  United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(citing United States v. Booker, 543 U.S. at 259).  See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes 'the relevant sentencing

rules . . . mandatory and impose[s] binding requirements on all sentencing judges' -- the statute falls outside the scope of *Apprendi*'s requirement."  (second alteration added by United States v. Booker)(quoting United States v. Booker, 543 U.S. at 221).  More recently, the Supreme Court held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence.  See Alleyne v. United States, 570 U.S. at 103.

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005)(McConnell, J.), the Tenth Circuit held that Blakely v. Washington and United States v. Booker did not change the district court's enhancement findings analysis.  See United States v. Magallanez, 408 F.3d at 684-85. United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant guilty of conspiracy to possess with intent to distribute and conspiracy to distribute methamphetamine.  See United States v. Magallanez, 408 F.3d at 676.  As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on government witnesses' testimony of the various amounts that they had sold to the defendant -- attributed 1,200 grams of methamphetamine to the defendant and used that amount to calculate his sentence under the Guidelines.  See United States v. Magallanez, 408 F.3d at 682.  The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months, based on the jury's 50 grams amount, to 121 to 151 months, based on the judge's 1,200 grams amount.  See United States v. Magallanez, 408 F.3d at 682-83.  On appeal, the Tenth Circuit stated that, both before and after Congress' passage of the "Sentencing Reform Act, sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict."  United States v. Magallanez, 408 F.3d at 684. Although United States v. Booker made the Guidelines ranges "effectively advisory," United

States v. Booker, 543 U.S. at 245, the Tenth Circuit reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before," United States v. Magallanez, 408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[6] "[T]he application of an enhancement . . . does not implicate the Supreme Court's holding in Apprendi v. New Jersey." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *7 (D.N.M. June 26, 2012)(Browning, J.). The Tenth

---

[6]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since characterized its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105). See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)). The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation). See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (concluding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

Circuit applies <u>Apprendi v. New Jersey</u>'s requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." <u>United States v. Price</u>, 400 F.3d 844, 847 (10th Cir. 2005). <u>Accord</u> <u>United States v. Ray</u>, 704 F.3d at 1314. A defendant may assert an error under <u>Apprendi v. New Jersey</u> only where the fact at issue increased his sentence beyond the statutory maximum. <u>See</u> <u>United States v. O'Flanagan</u>, 339 F.3d 1229, 1232 n.2 (10th Cir. 2003)(holding that a defendant could not assert an error under <u>Apprendi v. New Jersey</u>, because "his sentence does not exceed the statutory maximum"); <u>United States v. Hendrickson</u>, 592 F. App'x 699, 705 (10th Cir. 2014)(unpublished) (holding that, after <u>Alleyne v. United States</u>, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence"). The Court has noted:

> [A]lthough the decision of the Supreme Court of the United States in <u>Alleyne v. United States</u> . . . expands the rule from <u>Apprendi v. New Jersey</u>, . . . (holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence. <u>See</u> [<u>United States v. Sangiovanni</u>, No. CR 10-3239 JB,] 2014 WL 4347131, at *22-26 [(D.N.M. Aug. 29, 2014)(Browning, J.)].

<u>United States v. Cervantes-Chavez</u>, 59 F. Supp. 3d 1295, 1315 (D.N.M. 2014)(Browning, J.). The Supreme Court has clarified that "[b]oth the 'floor' and 'ceiling' of a sentencing range 'define the legally prescribed penalty.' . . . And under our Constitution, when 'a finding of fact alters the legally prescribed punishment so as to aggravate it[,]' that finding must be made by a jury of the defendant's peers beyond a reasonable doubt." <u>United States v. Haymond</u>, 139 S. Ct. 2369, 2378 (2019)(quoting <u>Alleyne v. United States</u>, 570 U.S. at 112-14). Further, the Tenth Circuit has determined that a district court could use its own finding on drug quantity to enhance a defendant's

Guidelines range consistent with <u>Alleyne v. United States</u>, "so long as the court does not use its own drug quantity finding to alter the defendant's *statutory* sentencing range."  <u>United States v. Cassius</u>, 777 F.3d 1093, 1094 (10th Cir. 2015)(emphasis in original).

### LAW REGARDING THE VULNERABLE-VICTIM ENHANCEMENT

The vulnerable-victim enhancement, U.S.S.G. § 3A1.1(b), provides:

> (b)    (1)    If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels.
>
>         (2)    If (A) subdivision (1) applies; and (B) the offense involved a large number of vulnerable victims, increase the offense level determined under subdivision (1) by 2 additional levels.

U.S.S.G. § 3A1.1(b)(1).  Application Note 2 to U.S.S.G. § 3A1.1 explains:

> For purposes of subsection (b), "vulnerable victim" means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct.
>
> Subsection (b) applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability.  The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim.  But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile.  Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.
>
> Do not apply subsection (b) if the factor that makes the person a vulnerable victim is incorporated by the offense guideline.  For example, if the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied unless the victim was unusually vulnerable for reasons unrelated to age.

U.S.S.G. § 3A1.1 Application Note 2.   "In order to classify a victim as 'vulnerable,' 'the sentencing court must make particularized findings of vulnerability.'"  <u>United States v. Brunson</u>, 54 F.3d 673, 676 (10th Cir. 1995)(quoting <u>United States v. Lee</u>, 973 F.2d 832, 834 (10th Cir.

1992)).  "The focus of the inquiry must be on the 'victim's personal or individual vulnerability.'"
United States v. Brunson, 54 F.3d at 676 (quoting United States v. Lee, 973 F.2d at 835).

"'[V]ulnerable victims' are those who are in need of greater societal protection."  United
States v. Brunson, 54 F.3d at 676.  "Specifically, the enhancement should apply when the victim
is 'less able to resist than the typical victim.'"  United States v. Scott, 529 F.3d 1290, 1300 (10th
Cir. 2008)(quoting United States v. Castaneda, 239 F.3d 978, 980 (9th Cir. 2001)).  "Moreover,
the vulnerable victim enhancement cannot be based solely on the victim's membership in a certain
class; the sentencing court is required to make particularized findings of vulnerability, focusing on
the individual victim and not the class of persons to which the victim belonged."  United States v.
Smith, 133 F.3d at 749.

In United States v. Janusz, 135 F.3d 1319 (10th Cir. 1998), the Tenth Circuit held that an
enhancement under U.S.S.G. § 3A1.1 was appropriate.  See United States v. Janusz, 135 F.3d at
1325.  The enhancement was appropriate because the sentencing court "made specific findings as
to the vulnerability of both [of the victims].  [One victim] was bedridden, unable to tend for
himself, sick and extremely vulnerable."  United States v. Janusz, 135 F.3d at 1325 (internal
quotation marks omitted).  The other victim "was confused about many things, very susceptible to
suggestion from anyone, including the defendant [and] . . . was extremely trusting in many
respects."  United States v. Janusz, 135 F.3d at 1325 (internal quotation marks omitted).  The
enhancement was also appropriate because the sentencing court "found a nexus between [the
victims]' vulnerability and the commission of the crimes."  United States v. Janusz, 135 F.3d at
1325.  The Tenth Circuit commented:

> It would be difficult, indeed, to imagine a stronger nexus.  The evidence indicate[d
> that the defendant] recognized [the victims]' age, wealth, and diminished physical
> capacity, and believing they would both soon die . . . devised a scheme to separate

them from their money by making loans which he would collect for himself after
their death.

United States v. Janusz, 135 F.3d at 1325  (citations omitted).  The Tenth Circuit provides that the

vulnerable-victim adjustment is warranted where "the defendant selected and targeted this

particular victim for the [offense] because of unusual characteristics."  United States v. Pearce,

967 F.2d 434, 435 (10th Cir. 1992).  The vulnerable-victim adjustment, however, "does not require

a finding that the defendant targeted the victim because of the victim's vulnerability."  United

States v. Checora, 175 F.3d 782, 789 n.4 (10th Cir. 1999).  See United States v. Smith, 133 F.3d

at 749; United States v. Hardesty, 105 F.3d 558, 560-61 (10th Cir.1997); United States v. Joe, 325

F. Supp. 3d 1226, 1230-31 (D.N.M. 2018)(Browning, J.), aff'd 2019 WL 3956431 (10th Cir. Aug.

22, 2019); United States v. Hubbard, No. CR 15-0430, 2016 WL 4009826, *4-5 (D.N.M. June 8,

2016)(Browning, J.).

### LAW REGARDING U.S.S.G. § 3B1.1 AGGRAVATING ROLE ENHANCEMENTS

Section 3B1.1 of the Sentencing Guidelines provides for enhancements to a defendant's

offense level based on a defendant having played an aggravating role in the offense.  Section 3B1.1

of the Sentencing Guidelines provides:

Based on the defendant's role in the offense, increase the offense level as follows:

(a)     If the defendant was an organizer or leader of a criminal activity that
        involved five or more participants or was otherwise extensive,
        increase by 4 levels.

(b)     If the defendant was a manager or supervisor (but not an organizer
        or leader) and the criminal activity involved five or more
        participants or was otherwise extensive, increase by 3 levels.

(c)     If the defendant was an organizer, leader, manager, or supervisor in
        any criminal activity other than described in (a) or (b), increase by
        2 levels.

U.S.S.G. § 3B1.1.  "A 'participant' is a person who is criminally responsible for the commission

of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1 Application Note 1.

Among the factors a sentencing court should consider when weighing an aggravating role

enhancement are:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1 Application Note 4.  The Tenth Circuit has "elaborated that '[i]n considering

these factors, the sentencing court should remain conscious of the fact that the gravamen of this

enhancement is control, organization, and responsibility for the actions of other individuals

because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential

figures.'"  United States v. Sallis, 533 F.3d 1218, 1223 (10th Cir. 2008)(quoting United States v.

Torres, 53 F.3d 1129, 1142 (10th Cir. 1995)).  See United States v. Vigil, 998 F. Supp. 2d 1121

(D.N.M. 2014)(Browning, J.)(refusing to find that nurse practitioner, who was illegally

distributing controlled substances, was a leader or organizer even though she was essential to the

success of the drug trafficking scheme).  "'A defendant's participation in illegal but lower-level

activities,' however, 'will not support application of the enhancement.'"  United States v. Vigil,

998 F. Supp. 2d at 1144-45 (quoting United States v. Sallis, 533 F.3d at 1223).  Nevertheless, "[a]

defendant may be eligible for the leader or organizer enhancement if he leads or organizes even

one other participant."  United States v. Damato, 672 F.3d 832, 847 (10th Cir. 2012).

The Tenth Circuit, in the context of conspiracies to distribute illegal drugs, has also

identified several factors which might indicate that a defendant exercised the requisite control over others, including that: other sellers worked for him, were recruited by him, or had their activities controlled by him; "he paid others for their efforts on behalf of the conspiracy;" "he restricted the people to whom other coconspirators could sell their drugs;" and "he controlled the manner of sales, set prices, or claimed the right to a larger share of proceeds." United States v. Anderson, 189 F.3d 1201, 1212 (10th Cir. 1999); see also United States v. Massey, 48 F.3d 1560, 1572 (10th Cir. 1995)(listing similar factors).

United States v. Sallis, 533 F.3d at 1223. "[A] 'role as a supplier of drugs to others, standing alone, is not enough' to justify a leader enhancement" under § 3B1.1, nor is "supplying drugs on credit, or fronting, without more." United States v. Sallis, 533 F.3d at 1223-24 (quoting United States v. Anderson, 189 F.3d at 1212)(citing United States v. Owens, 70 F.3d 1118, 1129 (10th Cir. 1995)).

"A two-level adjustment under § 3B1.1(c) applies whenever 'the defendant was an organizer, leader, manager, or supervisor in any criminal activity [involving less than five participants and that is not otherwise extensive].'" United States v. Wardell, 591 F.3d 1279, 1304 (10th Cir. 2009)(alterations in original)(quoting U.S.S.G. § 3B1.1(c)). See United States v. Tilga, 824 F. Supp. 2d 1295, 1319 n.12 (D.N.M. 2011)(Browning, J.)("Section 3B1.1(c) applies to leaders, organizers, managers, or supervisors of organizations with less than five persons. The only relevant difference between an organizer under § 3B1.1(a) and an organizer under § 3B1.1(c), it seems, is the size of the organization."). "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered." U.S.S.G. § 3B1.1 Application Note 3. "The [Sentencing] Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility." U.S.S.G. § 3B1.1, Background.

While there is overlap between the activities that would make a defendant a leader and those that would make a defendant an organizer, the two are distinct. "Functioning as a leader

requires an element of control over underlings, particularly in the form of recruitment and direction. To qualify as an organizer, however, no control is necessary." United States v. Wardell, 591 F.3d at 1304 (citations omitted)(citing United States v. Cruz Camacho, 137 F.3d 1220, 1224-25 (10th Cir. 1998); United States v. Egbert, 562 F.3d 1092, 1103 (10th Cir. 2009)). The Tenth Circuit has recognized that, as a result of the Commission's inclusion of managers or supervisors along with organizers in § 3B1.1(c), "a defendant may be punished as an organizer under § 3B1.1(c) for devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants." United States v. Valdez-Arieta, 127 F.3d 1267, 1272 (10th Cir. 1997). Thus, "'[t]he key to determining whether a defendant qualifies as an organizer is not direct control but relative responsibility.'" United States v. Wardell, 591 F.3d at 1304 (quoting United States v. Tejada-Beltran, 50 F.3d 105, 112 (10th Cir. 1995)).

## ANALYSIS

First, the Court concludes that D.S. was not a vulnerable victim to justify U.S.S.G. § 3A1.1(b)(1)'s 2-level enhancement, because he was not unable to protect himself and was not an atypical target of criminal activity. Next, the Court concludes that D.S. has a permanent disability to justify U.S.S.G. § 2A2.1(b)(1)(A)'s 4-level enhancement, because he has a bullet in his leg that doctors will not remove. Finally, the Court concludes that J. Martinez was an organizer to justify U.S.S.G. § 3B1.1(c)'s 2-level enhancement, because he placed a green light on D.S.

## I.      D.R. WAS NOT A VULNERABLE VICTIM.

U.S.S.G. § 3A1.1(b)(1) instructs the Court to apply a 2-level enhancement "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim."

U.S.S.G. § 3A1.1(b)(1).  Application Note 2 clarifies that "vulnerable victim" means "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1(b)(1) Application Note 2.   Application Note 2 further states that the enhancement applies only when the defendant knows or should know that the victim is unusually vulnerable.  See U.S.S.G. § 3A1.1(b)(1) Application Note 2.  The Tenth Circuit has explained that the enhancement applies where "the victim is unusually vulnerable or particularly susceptible to the crime committed," and where the victims "are unable to protect themselves [and] therefore require greater societal protection."   United States v. Proffit, 304 F.3d 1001, 1007 (10th Cir. 2002)(emphasis in original).  "[T]he vulnerable victim enhancement cannot be based solely on the victim's membership in a certain class; the sentencing court is required to make particularized findings of vulnerability, focusing on the individual victim and not the class of persons to which the victim belonged."  United States v. Smith, 133 F.3d 737, 749 (10th Cir. 1997).  "Not only must there be particularized evidence of a victim's vulnerability, but the evidence must also distinguish the victim as atypical of the usual targets of the relevant criminal conduct."   United States v. Caballero, 277 F.3d 1235, 1251 (10th Cir. 2002).  "A court may consider the totality of the circumstances in determining whether the victim was particularly susceptible to criminal conduct." United States v. Checora, 175 F.3d 782, 790 (10th Cir. 1999)(concluding that the fact that the victim "was intoxicated, outnumbered, and much smaller in stature than his assailants suggests to us, as it did to the district court, that he was particularly susceptible to the defendants' criminal conduct.").

In United States v. Clark, 403 F. Supp. 3d 1185 (D.N.M. 2019)(Browning, J.), the Court considered whether the vulnerable victim enhancement applied where a victim was incarcerated and had a green light placed on him.  See United States v. Clark, 403 F.Supp.3d at 1194.  The Court concluded that the victim was "particularly susceptible to being murdered," because "of the SNM hit on him, because of his incarceration with other SNM members who were ordered to act on the hit, and because of his limited ability to defend himself or escape from the surprise attack in his cell."  403 F.Supp.3d at 1194-95.  Moreover, in United States v. Clark, the victim attempted to protect himself by requesting to be moved outside of the SNM-filled pod in the prison, but corrections officers did not move the victim, and he was therefore unable to protect himself.  403 F.Supp.3d at 1194.  Additionally, the Court relied on trial testimony establishing that SNM kills members who talk with law enforcement, as the victim had, and "that SNM members knew [the victim] snitched made him particularly vulnerable to being murdered, especially because, if he was not killed, those tasked with killing him would be killed."  403 F.Supp.3d at 1194-95.

Similarly, in United States v. DeLeon, 437 F. Supp. 3d 955 (D.N.M. 2020)(Browning, J.), the Court applied the vulnerable victim enhancement where the victim was a member of the SNM gang, had a green light on him, and was incarcerated at the time of the murder.  See United States v. DeLeon, 437 F. Supp. 3d at 1019.  Specifically, the Court held in United States v. DeLeon that the victim, Frank Castillo, was vulnerable, because:

> (i) the SNM placed a hit on Castillo; (ii) Castillo was incarcerated with other SNM members who were ordered to carry out the hit; (iii) DeLeon, J. Gallegos, and Jaramillo outnumbered Castillo when they attacked and killed Castillo; (iv) DeLeon, J. Gallegos, and Jaramillo attacked and killed Castillo while he was intoxicated from heroin; and (v) Castillo could not defend himself or escape from the surprise attack in his cell.

437 F. Supp. 3d at 1021.  The Court determined that the defendant knew or should have known about these particular vulnerabilities and, consequently, that the vulnerable victim enhancement applied.  United States v. DeLeon, 437 F. Supp. 3d at 1021.

J. Martinez argues that D.R.'s drug use is insufficient to justify the Court applying the vulnerable victim enhancement.  See Objections at 2.  J. Martinez relies heavily on United States v. Harbison, 523 F. App'x 569 (11th Cir. 2013), to argue that a sentencing court can rely on a victim's drug addiction and drug use to determine that the victim was not vulnerable.  In United States v. Harbison, the United States Court of Appeals for the Eleventh Circuit rejected, however, the argument that "a victim's voluntary use of a controlled substance necessarily weighed against application of the enhancement."  United States v. Harbison, 523 F. App'x at 578.  Moreover, the Eleventh Circuit ultimately upheld the vulnerable victim enhancement's application, because the victim "was especially vulnerable, given her age, the age difference between the victim and Harbison, and the victim's drug-induced impairment."  United States v. Harbison, 523 F. App'x at 578.  The Eleventh Circuit concluded that the vulnerable victim enhancement was appropriate, despite the district court's conclusion that the "victim smoked crack cocaine, whether voluntar[ily] or involuntarily."  United States v. Harbison, 523 F. App'x at 578.  The USPO, however, does not rely on D.R.'s drug use to justify the vulnerable victim enhancement's application; rather, the USPO contends that D.R. was a vulnerable victim because M. Martinez placed a green light on D.R. before his murder, and the green light made D.R. more susceptible to murder.  See PSR Add. at 1.  The United States argues that D.R. was a vulnerable victim, because SNM members enticed him with drug use to come to the home where J. Martinez and others killed him, and D.R. was held down and attacked in a small room of the house that was akin to a prison cell.  See July 12 Tr. at 8:21-9:18 (Armijo).

The Court agrees with J. Martinez that D.R.'s voluntary drug use, on its own, is insufficient to support the vulnerable victim enhancement's application. The United States and the USPO also rely, however, on the green light on D.R. to establish that he was a vulnerable victim. While the Court concluded that, in part, the green lights on the victims in United States v. Clark and United States v. DeLeon justified the vulnerable victim enhancement, the Court cannot conclude D.R. is a vulnerable victim simply because he is in the class of people who have green lights on them; the Court instead must consider whether D.R. as a separate, unique individual was particularly susceptible to being killed. See United States v. Clark, 403 F. Supp. 3d at 1194; United States v. DeLeon, 437 F. Supp. 3d at 1019; United States v. Smith, 133 F.3d 737, 749 (10th Cir. 1997)(concluding that the Court must consider the individual victim rather than class of persons to which the victim belonged). Notably, there are similar attributes between the victims the Court found to be vulnerable in United States v. Clark and United States v. DeLeon -- namely, the victims' drug use at the time of the murder, the number of attackers, and the green light on the victims. See United States v. Clark, 403 F. Supp. 3d at 1194; United States v. DeLeon, 437 F. Supp. 3d at 1019. In both United States v. Clark and United States v. DeLeon, however, the Court relied on the fact that the victims were incarcerated at the time of their murders, and thus, were unable to protect themselves. See United States v. Clark, 403 F. Supp. 3d at 1194; United States v. DeLeon, 437 F. Supp. 3d at 1019. Here, D.R. was not incarcerated at the time he was killed. D.R. not being incarcerated is an important distinguishing factor, because the vulnerable victim enhancement applies only where the victims "are unable to protect themselves [and] therefore require greater societal protection." United States v. Proffit, 304 F.3d 1001, 1007 (10th Cir. 2002). When a victim is incarcerated and attacked in their cell -- as were the victims in United States v. Clark and United States v. DeLeon -- they are unable to protect themselves or seek safety. See

United States v. Clark, 403 F.Supp.3d at 1194; United States v. DeLeon, 437 F. Supp. 3d at 1019. The Court concluded that the vulnerable victim enhancement applies in United States v. DeLeon, in part, because "Castillo could not defend himself or escape from the surprise attack in his cell." 437 F. Supp. 3d at 1021. A prisoner can run and hide some, but not like a person outside of prison; a prison, by its very nature, imposes limits on running and hiding. Also, on the outside, a victim has a better chance of having a personal, powerful weapon -- whether legally or illegally -- than a person on the inside. A cell or a prison did not confine D.R. and thus render him unable to defend himself or escape from the attack, and therefore, D.R. was not especially vulnerable or in need of protection. A green light is scary, but it does not, at the moment of the crime, make one more vulnerable than another victim; indeed, a green light is often well known, and may give the victim an opportunity to arm up and be vigilant, making the victim less vulnerable than a random victim. A green light alone is not enough to render a victim vulnerable. Accordingly, the Court sustains J. Martinez' Objection to U.S.S.G. § 3A1.1(b)(1)'s 2-level enhancement.

## II.   D.S. SUSTAINED A PERMANENT INJURY.

The United States and the USPO agree that a 4-level enhancement pursuant to U.S.S.G. § 2A2.1(b)(1)(A) applies, because J. Martinez shot D.S., who had a permanent or life-threatening injury where the bullet remained inside his leg. See PSR Add. at 2; July 12 Tr. at 13:9-14:1 (Armijo). J. Martinez argues that the bullet inside D.S. alone does not support the enhancement's application. See Sentencing Objections at 3. For his position, J. Martinez cites only a case supporting the opposite conclusion. See Objections at 3 (citing with a "but see" United States v. Miner, 345 F.3d 1004, 1006 (8th Cir. 2003)(concluding that "the presence of a bullet inside [a victim's] body supports the permanent injury enhancement of U.S.S.G. § 2A2.1(b)(1)(A)").

- 37 -

U.S.S.G. § 2A2.1(b)(1)(A) instructs the Court to apply a 4-level enhancement if "the victim sustained permanent or life-threatening bodily injury."  U.S.S.G. § 2A2.1(b)(1)(A).  Application Note 1 to § 2A1.1(b)(1)(A) specifies that the definition of "permanent or life-threatening bodily injury" is the same as the definition in U.S.S.G. § 1B1.1.  U.S.S.G. § 2A2.1(b)(1)(A) Application Note 1.  U.S.S.G. § 1B1.1 defines "permanent or life-threatening bodily injury" as "injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent."  U.S.S.G. § 1B1.1 Application Note 1(K).  Several courts have held that a permanent injury, such as a scar or bullet, constitutes a permanent bodily injury to justify § 2A2.1(b)(1)(A)'s application.  For example, in United States v. Miner, 345 F.3d 1004 (8th Cir. 2003), the United States Court of Appeals for the Eighth Circuit concluded that "[t]he victim's permanent scar from removal of a bullet from his neck and the presence of a bullet inside his body supports the permanent injury enhancement of U.S.S.G. § 2A2.1(b)(1)(A)."  United States v. Miner, 345 F.3d at 1006.  See United States v. Bell, 742 F. App'x 439, 441-42 (11th Cir. 2018)(unpublished)(holding that a scar from a gunshot wound to the face is a permanent injury); United States v. Eloi, 652 F. App'x 786, 791 (11th Cir. 2016)(unpublished)(holding that a district court did not clearly err in concluding that an injury from being hit "in the head with a gun," which resulted in stitches and a scar, "constituted a permanent disfigurement"); United States v. Montalban, 604 F. App'x 100, 104 (3d Cir. 2015)(unpublished)(holding that facial scars remaining after hospitalization and nine stitches could constitute a permanent injury); United States v. Jim, 359 F. App'x 819, 821 (9th Cir. 2009)(unpublished)(concluding that a district court did not clearly err in concluding that a facial scar which resulted from an injury requiring seventy-two sutures and that was noticeable daily warrants a 7-level enhancement); United States v. Webster, 500 F.3d

606, 608 (7th Cir. 2007)("Prominent facial scars are a form of 'obvious disfigurement.'" (quoting United States v. Phillips, 239 F.3d 829, 848 (7th Cir.2001)); United States v. Bruce, 256 F. App'x 520, 522-23 (3d Cir. 2007)(unpublished)(concluding that scars on the body from being branded with the letters "IM thief" warranted a 6-level enhancement); United States v. Cree, 166 F.3d 1270, 1272 (8th Cir. 1999)(concluding that a facial scar constituted a permanent bodily injury); United States v. Akendeu, No. CR 18-0223 JB, 2019 WL 1002362, at *1 (D.N.M. March 1, 2019)(Browning, J.)(concluding that that a scar on the victim's shoulder "about the size of the bottom of a coke can" constitutes a permanent bodily injury).  Further, the United States Court of Appeals for the Seventh Circuit emphasizes the relevance of the word "permanent" when considering a victim's bodily injury.  See United States v. Phillips, 239 F.3d 829, 848 (7th Cir. 2001).  In United States v. Phillips, the Seventh Circuit concluded that a victim's "permanent and disfiguring scars on her face" constitute a permanent bodily injury.  United States v. Phillips, 239 F.3d 829, 848 (7th Cir. 2001).

At J. Martinez' trial, D.S. testified that J. Martinez shot him, and the bullet, "missed me by an inch and two centimeters by my artery, fractured my femur in two places, and I still have the bullet in me."  March 8 Tr. at 208:22-24 (Salazar).  After the shooting, D.S. underwent surgery at the University of New Mexico hospital in Albuquerque, New Mexico, but the doctors left the bullet inside his body.  See March 8 Tr. at 216:9-25 (Salazar, Armijo).  Additionally, Dr. MacArthur, a doctor at the University of New Mexico hospital, testified that D.S. presented with a broken pelvis and that the doctors elected not to remove the bullet from D.S.  See March 10 Tr. at 177:16-178:3 (MacArthur, Armijo).  Based on both D.S. and MacArthur's testimony at J. Martinez' trial, the Court concludes by a preponderance of the evidence that D.S. has a bullet in his leg from when J. Martinez shot him.  D.S. will have to live with the bullet inside of his body for the rest of his life.

Consequently, the bullet remaining in D.S.'s leg constitutes a permanent bodily injury sufficient to justify U.S.S.G. § 2A1.2(b)(1)(A)'s 4-level enhancement.  Consequently, the Court overrules J. Martinez' Objection.

## III.   J. MARTINEZ HAD AN ORGANIZATIONAL ROLE IN PLACING A GREEN LIGHT ON D.S.

J. Martinez contends that the Court should not apply U.S.S.G. § 3B1.1(c)'s 2-level enhancement, because there is no evidence that D.S.'s shooting involved anyone other than J. Martinez, and because J. Martinez did not have a management responsibility over SNM's property, assets, or activities.  In the PSR Add., the USPO contends that U.S.S.G. § 3B1.1(c) applies, not because J. Martinez shot D.S., but because J. Martinez "placed a 'green light' on D.S. and intended to have D.S. killed.  Because the defendant ordered the 'green light' on D.S., he is considered to have an aggravating role in this act."  PSR Add. at 3 (no citation for quotation).  The USPO contends that J. Martinez placing a green light on D.S. is an overt act that supports J. Martinez' VICAR conviction.  See PSR Add. at 3.  At the Sentencing Hearing, the United States argued that the enhancement applies, because J. Martinez was acting as a leader within the SNM by "taking initiative" and shooting D.S. after D.S. disrespected him.  July 12 Tr. at 20:2-8 (Armijo).

U.S.S.G. § 3B1.1(c) instructs the Court to apply a 2-level enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor" in any criminal activity other than those already covered by U.S.S.G. § 3B1.1(a) or (b).  U.S.S.G. § 3B1.1(c).  Application Note 2 to U.S.S.G. § 3B1.1 specifies:

> To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

U.S.S.G. § 3B1.1 Application Note 2.  "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1 Application Note 1.  In United States v. Valdez-Arieta, 127 F.3d 1267 (10th Cir. 1997), the Tenth Circuit concluded:

> While control over others is required for a finding that a defendant was a leader, supervisor, or manager, . . . no such finding is necessary to support an enhancement for acting as an *organizer* under § 3B1.1(c).  A defendant can organize an illegal activity without exercising control over the other participants in the activity.

United States v. Valdez-Arieta, 127 F.3d at 1270 (emphasis in original).  "[A] defendant may be deemed an organizer under § 3B1.1 for 'devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants.'"  United States v. Wardell, 591 F.3d 1279, 1304 (10th Cir. 2009)(quoting United States v. Valdez-Arieta, 127 F.3d at 1272).

Here, the Court concludes that U.S.S.G. § 3B1.1(c)'s 2-level enhancement applies, because J. Martinez organized a green light on D.S.  J. Martinez is correct that D.S.'s shooting did not involve any other participants, but the Tenth Circuit is clear that a defendant need not exercise control over another to justify the enhancement's application.  See United States v. Valdez-Arieta, 127 F.3d at 1270.  J. Martinez ordering a green light on D.S. is sufficient for the Court to conclude that J. Martinez has "'coordinated and overseen the implementation of the conspiracy.'"  United States v. Wardell, 591 F.3d at 1304 (quoting United States v. Valdez-Arieta, 127 F.3d at 1272).  Consequently, the Court overrules J. Martinez' Objection and applies U.S.S.G. § 3B1.1(c)'s 2-level enhancement.

**IT IS ORDERED** that: (i) the Defendant Jody Rufino Martinez's Objections to the

Presentence Report and Sentencing Memorandum, filed July 11, 2021 (Doc. 300)("Objections"), is: (a) sustained with respect to the Objection to U.S.S.G. § 3A1.1(b)(1)'s 2-level enhancement; (b) overruled with respect to the Objection to U.S.S.G. § 2A2.1(b)(1)(A)'s 4-level enhancement; (c) sustained with respect to the Objection to U.S.S.G. § 3C1.1's 2-level enhancement; and (d) overruled with respect to the Objection to U.S.S.G. § 3B1.1(c)'s 2-level enhancement; and (ii) the Offense Level remains 43, the Criminal History Category is VI, and the Guidelines range is life.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred J. Federici
   Acting United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Ryan Ellison
   Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

      *Attorneys for the Plaintiff*

Carter B. Harrison, IV
Nicholas Thomas Hart
Harrison & Hart, LLC
Albuquerque, New Mexico

      *Attorneys for the Defendant*